[Cite as *Horenstein, Nicholson & Blumenthal, L.P.A. v. Hilgeman*, 2021-Ohio-3049.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

|  |  |  |
|---|---|---|
| HORENSTEIN, NICHOLSON & BLUMENTHAL, L.P.A. | : | |
| | : | |
| | : | Appellate Case Nos. 28581 and 28838 |
| Plaintiff-Appellant | : | |
| | : | Trial Court Case No. 2017-CV-2666 |
| v. | : | |
| | : | (Civil Appeal from |
| JACK R. HILGEMAN, et al. | : | Common Pleas Court) |
| | : | |
| Defendants-Appellees | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 3rd day of September, 2021.

. . . . . . . . . . .

TERRY W. POSEY, JR., Atty. Reg. No. 0078292 and MARTIN A. FOOS, Atty. Reg. No. 0065762, 109 North Main Street, Suite 500, Dayton, Ohio 45402
    Attorneys for Plaintiff-Appellant, Horenstein, Nicholson & Blumenthal, L.P.A.

GEORGE D. JONSON Atty. Reg. No. 0027124 and G. TODD HOFFPAUIR, Atty. Reg. No. 0064449, 600 Vine Street, Suite 2650, Cincinnati, Ohio 45202
    Attorneys for Appellant, Craig T. Matthews

RICHARD A. BOUCHER, Atty. Reg. No. 0033614, 77 West Elmwood Drive, Suite 304, Dayton, Ohio 45459
    Attorney for Defendants-Appellees, Christopher F. Cowan and John P. Hilgeman

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1} This matter is before the court on two consolidated appeals following a bench trial. The first appeal (Case No. 28581) involves the appeal of Plaintiffs/Appellants, Horenstein, Nicholson, and Blumenthal, LLP. ("HNB"), from two judgments. The first judgment (issued on October 22, 2019) found HNB liable to Defendants/Appellees, John Hilgeman ("John") and Christopher Cowan ("Chris") (collectively "Appellees") on their counterclaims for defamation and false light and awarded them $200,000 in damages.[1] The second judgment (issued on June 9, 2020) awarded prejudgment and post-judgment interest to Appellees on the defamation and false light claims, and also found HNB had engaged in frivolous conduct under R.C. 2323.51. Pursuant to that finding, the trial court awarded Appellees attorney fees and costs.

{¶ 2} Appellant, Craig Matthews, the attorney for HNB, also appeals (in Case No. 28838) from the June 9, 2020 judgment awarding Appellees attorney fees and costs. In this judgment, the trial court found that Matthews was also guilty of frivolous conduct under R.C. 2323.51 and ordered him to pay attorney fees and costs to Appellees.

{¶ 3} According to HNB, the trial court erred in awarding judgment against it on the defamation and false light claims of Appellees, in imposing attorney fees for frivolous conduct, and in awarding prejudgment interest with respect to the defamation and false light claims. Matthews's position is that the trial court erred in awarding attorney fees against him based on frivolous conduct and also erred in the amount of fees awarded.

---

[1] Because two parties in the case (John and Jack Hilgeman) have the same last name, we will refer to individual parties by their first names, i.e., "John," "Jack," and "Chris." Jack did not appeal from the judgment and did not file a brief. As a result, when we are referring to John and Chris collectively, we will refer to them as "Appellees."

**{¶ 4}** In the October 22, 2019 judgment entry, the court also found in HNB's favor on a breach of contract claim against Defendant, Jack Hilgeman ("Jack"), and awarded damages for the breach. In addition, the court rejected Jack's counterclaim for defamation and false light against HNB, as well as HNB's claims against Jack for violation of Ohio's trade secrets law and fraud. Finally, at trial, the court granted the Civ.R. 41(B)(2) motion of Appellees and their law firm, Cowan and Hilgeman (C&H), to dismiss the trade secret and fraud claims HNB made against them. None of these rulings have been appealed, and no assignments of error have been asserted. Jack and C&H are also not parties to the appeal.

**{¶ 5}** After reviewing the record, we conclude that the trial court erred by finding in Appellees' favor on their claims for defamation and false light. HNB's complaint and an affidavit filed in support of a temporary restraining order were absolutely privileged, and Appellees' counterclaims did not state a cause of action, because the alleged defamatory statements bore some reasonable relation to the judicial proceeding. Furthermore, as to statements that HNB's attorney made in a newspaper article and in a "tweet," even if these statements were considered defamatory, HNB would be vicariously liable only if it authorized or ratified the statements. However, there was no evidence that HNB did so.

**{¶ 6}** Furthermore, the statements in a newspaper article and in the tweet were not defamatory as a matter of law, under the totality of the circumstances and reading the statements in the context of the publication and how a reasonable reader would interpret them. Accordingly, the judgment in Appellees' favor on the counterclaims must be reversed. In light of this conclusion, the trial court's June 9, 2020 judgment awarding prejudgment and post-judgment interest on the counterclaim judgment must also be

reversed.

{¶ 7} We additionally conclude that there was competent, credible evidence to support the trial court's finding that HNB and Matthews engaged in frivolous conduct concerning the trade secret and fraud claims against Appellees. However, the trial court's decision to assess fees from the date the complaint was filed was not supported by competent evidence and was not based on sound reasoning. This is because under R.C. 2323.51(A)(2)(a)(iii), parties only need minimal support for their allegations to avoid a finding of frivolous conduct. Parties are allowed to investigate the truth of allegations or factual contentions. However, if parties persist in relying on the allegations when they are known to be unsupported by evidence, then they have engaged in frivolous conduct. Here, HNB knew by September 28, 2018, that its fraud and trade secret claims against Appellees were unsupported by the evidence, and damages were properly assessed only after that date.

{¶ 8} Because the trial court awarded attorney fees and costs for a significantly longer period, the award for attorney fees and costs must be reversed and remanded for further proceedings. In addition, the trial court erred in awarding Appellees attorney fees for work performed by Jack, who was an attorney and co-defendant, on his own claims. HNB and Matthews were not guilty of frivolous conduct with respect to Jack. Furthermore, the use of the word "attorney" in R.C. 2323.51 connotes an agency relationship between two parties; therefore, fees an attorney might charge himself are not "attorney fees." Appellees may, however, be entitled to fees for work Jack performed solely on their behalf for the fraud and trade secrets claims (in addition to their retained attorney's fees for those claims), if they can establish that they were "legally obligated" to

pay him fees.

**{¶ 9}** Finally, Matthews's arguments about the ratio the trial court applied in awarding fees for work Jack performed on his own claims are moot, given the necessity to reverse the attorney fee award and remand for further hearing.

**{¶ 10}** Accordingly, HNB's first and third assignments of error will be sustained, and HNB's second assignment of error will be sustained in part and overruled in part. Matthews's first assignment of error will be sustained in part and overruled in part, and Matthews's second assignment of error will be sustained in part and overruled in part as moot.

**{¶ 11}** Because certain aspects of the October 22, 2019 judgment have not been appealed, that judgment will be affirmed in part and reversed in part. Specifically, the October 22, 2019 judgment in favor of John Hilgeman and Christopher Cowan on their counterclaims for defamation and false light will be reversed, and the remainder of that judgment will be affirmed.

**{¶ 12}** Concerning the June 9, 2020 judgment on the post-trial motions, that judgment will be reversed in part and affirmed in part. The judgments for prejudgment and post-judgment interest will be reversed. However, the trial court's judgment that HNB and Craig Matthews engaged in frivolous conduct will be affirmed in part and reversed in part as to the date on which the frivolous conduct began and the time from which attorney fees may be calculated. The award of attorney fees will be reversed and remanded for further hearing on what attorney fees may be awarded to Appellees in connection with the claims against them that were based on trade secrets and fraud.

## I. Facts and Course of Proceedings

{¶ 13} Because a clear understanding of the factual background is important in understanding the issues, we will outline the facts in some detail.

{¶ 14} HNB is a law firm that specializes in the following areas of legal practice: workers' compensation, personal injury, social security disability, and veterans' disability. Transcript of Proceedings ("Trial Tr."), p. 164. During the times relevant here, HNB was divided into three profit centers based on area of practice. Each center was really its own business under the corporate shell, but shared certain allocated expenses like rent, office administrator, receptionist, and so on. *Id.* Workers' compensation ("WC") and personal injury ("PI") cases were combined in one profit center. *Id.* Each center had its own year-end profit, based on how well that center performed during the year. *Id.* at p. 165.

{¶ 15} Bruce Nicholson ("Bruce") was licensed to practice law in 1977 and had been handling WC claims for HNB and its predecessor firm since 1980. *Id.* at p. 162-163. Bruce had been a shareholder with HNB since 1984, and he was solely in charge of the WC/PI profit center until around 2010, when another WC attorney working in the center, Fred Sommer ("Fred"), became a shareholder. *Id.* at p. 165 and 881.

{¶ 16} After 1984, the WC practice did very well until the economic downturn in 2008-2009, when auto plants and the shops supporting them closed. *Id.* at p. 168-170. At that point, HNB decided to expand and increase its PI practice rather than referring PI clients to other firms. *Id.* at p. 170. The firm also invested heavily in marketing, which was successful, and the PI client list began to grow. *Id.* at 173 and 175.

{¶ 17} In May 2012, HNB hired Jack as an associate to work in both WC and PI,

but primarily PI.  *Id.* at p. 178 and 180.   Jack had graduated from law school in 2010 and had worked at "C&H" from 2010 to 2012.   *Id.* at p. 180, 709, and 734.   The partners in that firm were John (Jack's father) and Chris, who had been in practice together as C&H since 1990.   *Id.* at p. 834.

**{¶ 18}** Jack signed an employment agreement with HNB on May 18, 2012, and then signed a second agreement on January 2, 2014.   Trial Tr. at p. 180-181 and Plaintiff's Exs. 8 and 9.

**{¶ 19}** The agreements contained essentially the same provisions.   Under paragraph C, Jack agreed:

(1) To work exclusively for Employer unless prior written approval is granted by Employer for other employment.   Employee understands that this restriction is all-encompassing and includes both full time and part time positions, both within and outside the realm of the practice of law.

(2) To abide by all of the Cannons of Professional Responsibility and related disciplinary rules and ethical considerations as promulgated by the Ohio Supreme Court and all other courts and administrative agencies before which Employee appears in his capacity as a lawyer.

(3) To work competently, professionally, and honestly as a lawyer and to complete all assignments from Employer as reasonably directed by Employer.

Ex. 9 at p. 1.

**{¶ 20}** Paragraph D of the agreement further provided that:

(1) All client files that are opened by Employee shall be the property

of Employer.

(2) All fee agreements executed by Employee and new clients shall be between the client and Horenstein, Nicholson & Blumenthal, LPA.

(3) Employee agrees to provide a full accounting and status report of all files opened by Employee upon request of Employer.

(4) In the event that the employment relationship between the parties should be terminated, the ownership of the client files shall remain with the Employer.

Ex. 9 at p. 2-3.

{¶ 21} And finally, concerning termination of employment, the agreement stated that:

F. This employment agreement may be terminated by either party hereto upon written notice to the other party at least sixty (60) days prior to the effective date of said termination.

G. In the event of the termination of this employment agreement, all client cases and all client files shall be and shall remain the sole property of Horenstein, Nicholson & Blumenthal. All fees generated by said cases and by files shall be and shall remain the sole property of Horenstein, Nicholson & Blumenthal.

Ex. 9 at p. 4.

{¶ 22} The agreements provided for an annual salary, but generally HNB also gave associate attorneys a bonus. Trial Tr. at p. 187 and 781, and Plaintiff's Ex. 6. In a letter accompanying the employment offer, Bruce stated that if Jack performed well and if their

business progressed, HNB would elevate him to a "percentage associate," which would allow his income to be based on the net profit of the WC/.PI center and give Jack an incentive to grow the business. The letter also stated that this opportunity would be considered after Jack had completed three full years with the firm, in January 2016. *Id.* at p. 780-781, and Plaintiff's Ex. 6, p. 2.

{¶ 23} Beginning in 2012 and continuing each year until Jack left HNB in May 2017, the firm gave Jack a bonus, and Jack was happy with his bonuses. *Id.* at p. 187 and 782, and Plaintiff's Ex. 57.

{¶ 24} As indicated, Jack was hired to help grow the PI practice, and he did so. When Jack was hired in 2012, there were about 30 to 40 PI clients; by the time he left HNB in May 2017, the firm had about 287 PI clients. Trial Tr. at p. 318. The PI profit began to exceed that of the WC practice. This was primarily because the WC practice had more overhead, due to the current employees' length of service and the fact that HNB had to keep servicing WC cases for many years after they were opened. *Id.* at p. 170-171, 193, and 259. As a result, Jack's bonus was increased. For example, Jack's total wages (including bonuses), increased substantially between 2013 and 2015 (respectively, $85,000 and $132,329.35). *See* Plaintiff's Ex. 57.

{¶ 25} In December 2015, Bruce, Jack, and Fred discussed how to allocate fees. Bruce then prepared identical 2016 employment agreements for all three parties, calling for each of them to have an $85,000 draw, consistent with Jack's current draw under the 2014 agreement. *Id.* at p. 435 and Plaintiff's Ex. 10. Bruce sent the agreements to Fred and Jack, noting that they had agreed to the concept that they each would have minimum income levels, and once that level had been reached, regardless of source, additional

profit would be divided in part based on the ratio of fees between the PI and WC practices. *Id.* at Ex. 10. Bruce further noted that once they had reached a formula, the 2016 agreements would be amended. *Id.* Both Bruce and Fred signed the 2016 agreement, but Jack did not. *Id.* at p. 438.

{¶ 26} In late February 2016, Bruce noticed that Jack had not signed the 2016 agreement and asked if they could meet to discuss it. *Id.* at p. 249 and Plaintiff's Ex. 11. Bruce and Jack then met on February 29, 2016, and discussed matters. Bruce reminded Jack that he was still contractually bound by the 2014 agreement until a new contract was signed. *Id.* at p. 250. At that point, Jack did not refuse to sign the contract; he simply said he would think about it. *Id.*

{¶ 27} The following day, Bruce sent Jack an email indicating that his recollection of the meeting was that Jack did not want to sign the agreement in its current form, but would "get busy" with his spreadsheet and a formula and make a proposal. *Id.* at Plaintiff's Ex. 12. Bruce further said that:

> As I stated many times last night, you're doing an excellent job. I want to do all that I can to encourage you and to help you reach your goals. I want you to become a shareholder soon. My perspective approaching my last couple of years at HNB is understandably quite different from your perspective at the early stages of your career. I have been on both ends of the compensation issue, have won some and lost some, and therefore understand your concerns. I'm confident that you will reach your financial goals if you continue your hard work and keep [sic] continue your resourcefulness and energy for your job. However, regardless of your

income level, you will never be fulfilled solely by achieving financial success. I've known too many lawyers who make huge bucks and are total train wrecks. – So much for the lecture. We will have many more discussions and get this worked out.

Plaintiff's Ex. 12.

{¶ 28} On August 2, 2016, Bruce sent Jack a proposal for an ownership interest in HNB. Trial Tr. at p. 244 and Plaintiff's Ex. 14. In the email, Bruce indicated it was a document that he had drafted several years ago when Fred became a shareholder. The document was also clearly marked "Draft" on every page. *Id.* Bruce further stated in the email that "When this is implemented we (you, Fred, and me) must have an agreement on sharing the net profit of our profit center as you will see when you read the agreement." *Id.* at Ex. 14. The email also said, "Assuming you agree to becoming a shareholder, I see this happening in the first six months of 2017." *Id.*

{¶ 29} In addition to requiring a profit-sharing agreement, the shareholder proposal itself contained various conditions, including Jack's assumption of a proportionate share of liability of HNB, a capital contribution by Jack, disclosure of Jack's own personal finances and verification of such by HNB's accountant, and a background check of Jack to determine his legal history and financial suitability. Plaintiff's Ex. 14, Proposal for Ownership Interest, p. 1-2.

{¶ 30} The same day, Jack responded to Bruce's email and told him he would review the document and get back to him as soon as possible. Plaintiff's Ex. 15. At the time, it was common knowledge that Bruce anticipated retiring in 2019, and Bruce had also told Jack this. Trial Tr. at p. 717-718. Jack did not get back to Bruce about the

shareholder proposal.   *Id*. at p. 286.   Jack also never executed the document, nor did he make a capital contribution.   *Id*. at p. 284.

**{¶ 31}** In October 2016, Jack and Bruce discussed adding staff to the PI practice due to volume.   *Id*. at p. 273-274 and Plaintiff's Ex. 17.   On December 14, 2016, Bruce, Fred, and Jack met at the Dayton Racquet Club ("DRC") to discuss the year-end financials, staff bonuses, and attorney bonuses.   *Id*. at p. 455 and 789.   Jack did not have any legal authority to decide how the money was distributed, but he was invited to the meeting.   *Id*. at p. 455

**{¶ 32}** Before the meeting, Jack sent Bruce an email on December 12, 2016. In the email, Jack asked if they could meet in January 2017 to discuss Jack's concerns about the future of the PI practice.   *See* Ex. 18.   In response, Bruce set a meeting for January 9, 2017, and also asked if Jack had a proposal or plan that he could send Bruce before the meeting.   *Id*.   Jack did not send a proposal; instead, he sent Bruce a spreadsheet comparing net profits of the WC and PI practices.   *Id*.

**{¶ 33}** During the December 14, 2016 meeting, Bruce, Fred, and Jack discussed the fact that 2016 had been a somewhat disappointing year, and the net profit was only $130,000.   *Id*. at p. 455 and 721.   Prior to the meeting, Bruce had decided that Jack had done a great job that year, and they would divide the net profit by three, which he felt was generous and equitable.   *Id.* at p. 455.   When told of this, Jack looked obviously disappointed, and Bruce asked what was wrong.   Jack then said he did not think that was reasonable or fair; when Bruce asked what would be fair, Jack said he thought he should get it all.   *Id*. at p. 255-256.   Bruce thought this was way out of line, and told Jack that would not happen.   *Id*. at p. 256.

{¶ 34} During the meeting, there was a long discussion on how to divide bonuses. Jack's opinion was that there should be some consideration for performance-based bonuses. Trial Tr. at p. 721-722. The meeting ended on a friendly basis, with no specific resolution, and after the meeting, Fred told Bruce to do whatever he wanted about the bonuses. *Id.* at p. 257. Fred and Bruce decided to give Jack 40%, while retaining 30% each for themselves. They hoped this would express to Jack that they wanted him to be part of their practice, and Jack later expressed appreciation. *Id.*

{¶ 35} The day after the meeting, Bruce drafted a memo to Jack and Fred, stating that he would be retiring on June 23, 2017, which was quite a bit earlier than expected. *Id.* at p. 279. The initial part of the memo said that:

> I appreciated our candid discussion of the financial issues last night. I respect everyone's honesty and point of view. Money issues are challenging. These discussions tend to reveal the core values and priorities of the people involved. As shown last night, our values and priorities are different. In my opinion, this is because we are at different states of our career, and we each have our individual needs, and there is an inherent mistrust that is hard to avoid.
>
> Jack's perspective on profit sharing is obviously different from mine. I do not expect our opinions on these issues will change. I do not foresee the net profit of the workers' compensation practice improving substantially prior to my previously planned retirement date of December 31st, 2018.

*Id.* at p. 279-280, and Plaintiff's Ex. 19.

{¶ 36} According to Bruce, he had been thinking for some time about retiring, and

the decision had nothing to do with the meeting at the DRC. In this regard, Bruce noted that the disproportion of profits between WC and PI would continue to widen and was not within his short-term control. He hoped his retirement would "perhaps, alleviate some of the downside pressure on the profitability of the workers' comp practice." *Id.* at p. 281 and Plaintiff's Ex. 19. And finally, Bruce stated in the email that Jack and Fred would "need to continue the discussion and reach agreement on how to move forward from July 1st forward." *Id.* at Plaintiff's Ex. 19.

{¶ 37} On December 15, 2016, Bruce attached the above memo to an email that was sent to Jack and Fred, informing them of the 40/30/30 split applicable to bonuses. *See* Plaintiff's Ex. 20. On December 16, Jack sent Bruce an email expressing shock at the decision. Trial Tr. at p. 284-285; Plaintiff's Ex. 21, p. 1. In this email, Jack stated that:

> You have always been more than transparent with me – and a short email response is not nearly sufficient to express my gratitude for the years of honesty. * * * It goes without saying that I will do everything I can to help during this transition, whether it be covering hearings, meeting with PNCs [potential new clients], etc. Please let me know if there is anything I can do – I will obviously communicate this to Fred, too.

Trial Tr. at p. 285-286 and 724; Plaintiff's Ex. 21 at p. 1.

{¶ 38} Subsequently, on January 9, 2017, Bruce, Fred, and Jack met at a restaurant. Normally, Bruce and Jack met during January to discuss the previous year; Fred had never been part of this meeting, but elected to attend after receiving Bruce's resignation letter. Trial Tr. at p. 726-727. Jack was concerned about his position in the

firm now that Bruce was retiring. *Id.* at p. 727. During the meeting, they rehashed Jack's thoughts on a compensation system that was "performance-based, efficiency-based, volume-based, responsibility-based." *Id.* at p. 728. According to Jack, it was clear to him after this meeting that the system on allocating bonuses would not change from the status quo. *Id.* at p. 729.

{¶ 39} There was a dispute, factually, about what occurred during this meeting while Bruce left to go to the restroom. Jack testified that he inquired about what was going to be done about the partnership that Bruce had offered to him in August; Fred denied that Jack had been offered one. When Jack said that he had an email, Fred stated, "No, No. You haven't been here ten years. You haven't been here ten years. I had to be here ten years." *Id.*

{¶ 40} Fred denied that this conversation ever occurred. According to Fred, he and Jack talked casually, but not about the firm. *Id.* at p. 881. Fred also said he explained to Jack that he wanted him to be a percentage associate so he could share in the profits of their profit center. Fred further said that this had been the case since Bruce and he had tried to get Jack to sign the 2016 employment agreement, which would have allowed Jack to share in the profits. *Id.* at p. 882.

{¶ 41} According to Jack, Bruce and Fred told him during the January 2017 meeting that he should not want to be a partner due to the liability, and that they would discuss it further before putting together a compensation proposal. *Id.* at p. 729-730. There was no follow-up meeting after that. Jack additionally said that he asked Fred about it every few weeks, but Fred only said he would have to think about it and that they would get together. However, that never happened. *Id.* at p.731-732.

{¶ 42} Until the day Jack left, Bruce was confident that he would be able to reach an agreement with Jack. Bruce stated that if they had agreed on Jack's compensation, Jack would probably have become a shareholder. However, Jack became evasive about it, as if he did not want to address it. Trial Tr. at p. 245. Before leaving, Jack never provided Bruce with a proposal concerning the shareholder proposal, the buy-sell agreement, or what financial numbers he desired. *Id.* at p. 266, 277, 279, 283, 287 and 767.

{¶ 43} Before and during Jack's tenure, HNB used computer software called "Prevail" to keep track of all activity on cases and for case management. *Id.* at p. 208. However, Jack used a second record of cases to run his practice on what was called the "N" drive, which was a drive located within the PI folder on the firm's server. *Id.* at p. 145 and 211. For example, Jack had imported control sheets and kept a set of fairly complex Excel spreadsheets on the N drive that tracked his cases. *Id.* at p. 427-428. Bruce was not aware that Jack was using the N drive or that he was using it for a primary method of case management; Bruce had no reason to monitor Jack's activities or to know that Jack was doing this. *Id.* at p. 212-213 and 238.

{¶ 44} A forensic analysis of the N drive indicated an average of 200 accesses per month between March 2016 and December 2016, which demonstrated a "predictable file access pattern." In February 2017, the pattern changed "dramatically," resulting in a spike "with an average of 871 files accesses and a peak of nearly 1,200 accesses in March 2017." According to a computer networking and security expert hired by HBN, this indicated "a targeted and systematic copy of client data files" between February and May 5, 2017. *Id.* at p. 145-147, and Plaintiff's Ex. 60, p. 35.

**{¶ 45}** On March 22, 2017, Jack sent his father, John, an email, setting up a meeting at John's office for March 27, 2017.   Jack, John, and Chris were at the meeting, and Jack brought an agenda.   *Id.* at p. 567; Plaintiff's Exs. 23 and 24.   The agenda was marked "CONFIDENTIAL" and contained the following items:

    1.   Currently in negotiations with Fred Sommer of HNB.   To the extent unable to reach agreement, contingency plan.

    2.   My Practice:   PI; MM; NH Negligence; Product Liability; WC.

    3.   Available Office – Cost to Rent?   Hoglund?   Improvements to available office.

    4.   Staff Support.

    5.   Phone System.

    6.   Website.

    7.   Health Insurance.

    8.   Malpractice Insurance.

*Id.* at Plaintiff's Ex. 24.

**{¶ 46}** During the meeting, John made written notes on the agenda about various matters.   Trial Tr. at p. 567.   These notes included: "end April early May"; "Michelle," next to "Staff Support";[2] "separate phone systems"; "Chris no problem" next to "Website"; the name of C&H's health insurance agent, and with respect to "Malpractice Insurance," "500 1M, 1 M 2M, 2M 4M" (which would be the limits of malpractice policies).   *Id.* at p. 568 and Plaintiff's Ex. 24.

**{¶ 47}** Jack called his father, John, around the end of April and said that he was

---

[2] Michelle was Jack's paralegal at HNB.

likely going to leave HNB because it had been a month and he had not heard anything from Fred. He asked if there would even be room for him at C&H if he decided to leave HNB. Trial Tr. at p. 734. On April 27, 2017, at 10:16 a.m., John received an email from his current tenant, Robert Tadych, confirming, after conversations with John, that the terms of the lease agreement would be changed to vacate an office suite currently being used and to sell the furniture in exchange for a rent credit. The effective date of the lease changes was May 1, 2017, and the office suite was the one that Jack occupied after he went to C&H. *Id.* at p. 569-570, and Plaintiff's Ex. 25.

{¶ 48} On April 27, 2017, Jack created a "mail merge" file of the PI clients at HNB and printed it on April 29, 2017. The evidence of this was destroyed before Jack left HNB but was later recovered through a forensic search of Jack's desktop computer. Trial Tr. at p. 140-142 and 148; Plaintiff's Ex. 60, p. 14 and 31-32. Jack admitted creating a mail merge file. He also said it was "probably accurate" that he printed labels at the firm using his desktop computer and printer, but that he could not specifically recall doing it. *Id.* at p. 602-603. Between April 6, 2017, and May 5, 2017, Jack and his paralegal accounted for over one-half of the printing volume in the firm, although there were a dozen users on the system. *Id.* at p. 148-149.

{¶ 49} On May 1, 2017, John received an email from Sampson Paper Company, attaching a letterhead proof for new letterhead for C&H that included Jack's name. At 3:08 p.m., John sent a reply, stating, "Looks perfect. Please expedite my offer. We would love to have the product by the end of the week if possible." *Id.* at p. 570-571 and Plaintiff's Ex. 26. John copied Jack with the email, and at 4:00 p.m., Jack asked John to add both an asterisk and "Also licensed in California" to the letterhead. *Id.* John then

replied to Jack on May 2, 2017 at 9:37 a.m., "Already ordered. How about the next batch." *Id.*

{¶ 50} Also on May 2, 2017, at 11:38 a.m., Jack purchased a $1,234 computer to be sent to the offices of C&H. The shipping method was "2nd Business Day Delivery." Trial Tr. at p. 575 and 597, and Plaintiff's Ex. 27. C&H did not provide Jack with a computer. *Id.* at p. 576.

{¶ 51} On Thursday, May 4, 2017, at 9:06 a.m., Jack sent an email to printpointprinting.com, stating, "Please see attached per my discussion with Janelle. I apologize if the spelling is incorrect this morning. I would like 400 copies on a cream colored paper." *Id.* at p. 574 and Plaintiff's Ex. 26.

{¶ 52} Also on May 4, 2017, at 10:55 a.m., John sent an email to his tenant with an attached letter marked "confidential." The letter concerned the new lease arrangements. Among other things, the letter stated that "[i]t was also agreed that Jack Hilgeman would purchase the office furniture (office desk, small table, bookcase, chairs and shredder) in the former office for $450. I will talk to Jack about payment arrangements and preparing a bill of sale, and he or I will contact you in the next few days to formalize the purchase." *Id.* at p. 295 and 576, and Plaintiff's Ex. 28. The email was copied to both Jack and Chris. *Id.*

{¶ 53} According to Jack, he did not make a decision to leave HNB until May 4, 2017, after a meeting he had with Fred at around 4:00 p.m. There is a dispute about what occurred that day. At around 4:00 p.m., Jack went to Fred's office and asked to talk to him. Jack inquired about how the compensation system would be set up with Bruce retiring. Fred said he had been thinking about it, but had not talked to Bruce about

it. When Jack mentioned that he had received 40% the last year, Fred said, "Well, I think you're going to go down to 20 or 25 percent because that's about what I was paid when I was an associate here after five years." Trial Tr. at p. 736-737. Again, according to Jack, Fred also said that he could not guarantee that Jack would be a partner if he were there ten years. *Id.* at p. 737.

{¶ 54} Fred denied discussing Jack's future as a shareholder and how he viewed the future division of net profits on May 4, 2017. *Id.* at p. 556-567. Fred characterized the meeting as having lasted about five minutes with Jack doing 99 percent of the talking. *Id.* No meeting had been scheduled, and Fred had just come back from hearings. Fred told Jack that they would discuss finances at a later date, and that there was plenty of time based on Bruce's explanation that all this needed to be set up by July 1. *Id.* at p. 559 and 563.

{¶ 55} According to Jack, he did not make a decision on leaving the instant he talked with Fred. Jack testified that he was a little bit in shock at the way things "all of a sudden" were going the other way. After having a meeting with a new client at around 4:30 p.m., Jack sat in his office and said to himself, "Am I really going to quit?" *Id.* at p. 740-741. On May 4, Jack then printed the letters to his active clients, packaged up the envelopes, and went home. *Id.* at p. 742-743 and Defendant's Ex. G. The letter to Jack's clients was dated May 5, 2017, was addressed to each client individually, and bore the letterhead of C&H, which included Jack's name, along with those of John and Chris. The letter also included transfer forms, and stated, in part:

I hope this letter finds you well. Please be advised that on this same date, I accepted a partnership position with the law firm Cowan & Hilgeman

managing its injury litigation department. Similar to my old firm, I will be responsible for all personal injury matters handled by the firm. Cowan & Hilgeman is located in downtown Dayton and has nearly 70 years of combined legal experience assisting clients in all aspects of the law.

Defendant's Ex. G.

{¶ 56} On May 5, 2017, Jack and John met for breakfast. At the time, Jack had 225-230 sealed and stamped letters in his car that were addressed to clients. Trial Tr. at p. 601-602. At trial, Jack and John both denied that Jack told John that he was depositing letters in the mail. *Id.* at p. 580-582, 602, and 743. According to John, Jack said he was going to resign and was going to contact clients, and John said "okay." *Id.* at p. 581. After breakfast, Jack drove to the post office, mailed the letters, and then drove to HNB's office, where he worked the rest of the day, but did not tell anyone at the firm what he had done. *Id.* at p. 602 and 743. Around 4:00 p.m., Jack went down to Fred's office to resign, but Fred was not there. Jack then told his paralegal, Michelle, that he was leaving the firm. After a discussion in the parking lot, Jack offered Michelle a position and she accepted. *Id.* at p. 699-701, and 744-745. Jack and Michelle then returned to the office and packed their things. *Id.* at p. 745.

{¶ 57} At about 7:00 p.m. on May 5, 2017, Jack copied all the active PI client files from the N drive to a personal storage device (a thumb drive). The files included those of personal injury clients, employment clients, product liability clients, and nursing home abuse clients. Jack then took the thumb drive to C&H and copied it to the new computer he had purchased. *Id.* at p. 597-598 and 745.

{¶ 58} A forensic analysis of Jack's HNB desktop computer indicated that it had

been purged of the kinds of documents that would be consistent with continued use and preservation of that particular computer. This was based on the "relatively small percentage of existing files with a 2017 timestamp." *Id.* at p. 135-137 and Plaintiff's Ex. 60, p. 25 and 28-29. Jack's email folders were also empty of content, with the last access having been on May 5, 2017, at around 7:30 p.m. This demonstrated "a conscious effort on behalf of an authenticated user to remove content from the Outlook data file." *Id.* at p. 139-140 and Ex. 60 at p. 29-30.

{¶ 59} The workweek at HNB ended on Friday at 5:00 p.m. Trial Tr. at p. 537. It was common knowledge in the office that Fred did not have a "smart phone" and did not check his email on weekends. *Id.* at p. 96 and 300. At the time, Bruce was also out of the office on vacation in Arizona. The vacation had been listed on the firm's calendar, which was available to all attorneys and staff. In addition, the calendar listed when people were going to be out of the office. *Id.* at p. 105-106, 213, and 324. Jack also knew Bruce was in Arizona, as they had spoken about it. *Id.* at p. 237.

{¶ 60} At 9:45 p.m. on Friday evening, Jack sent a brief email to Fred, stating that this email would serve as his "formal resignation, effectively immediately." *Id.* at p. 299 and Plaintiff's Ex. 31. Jack did not notify Bruce, nor did he copy him with the email. *Id.* at p. 299. Fred did not learn of the resignation until he came into the office on Monday, May 8, 2017. *Id.* at p. 543. Bruce first learned of the resignation slightly earlier, when a paralegal from the firm called him at 6:00 a.m. Arizona time (9:00 a.m. Dayton time) on Monday. *Id.* at p. 303-305. Bruce then called Jack, who refused to discuss details other than to tell him to talk to Fred. During the conversation, Jack read Bruce the letter that he was sending to clients. *Id.* at p. 304-305. Bruce then drafted a letter to clients and

instructed the office to send out a mass mailing to all the PI clients. *Id.* at p. 303.

{¶ 61} Also on May 8, 2017, Jack, John, and Chris entered into a partnership agreement which provided that each would pay one-third of partnership expenses and would retain all income derived from his efforts, unless otherwise agreed. The agreement additionally contained a provision requiring 30-day notice for a partner to withdraw. *Id.* at p. 308 and 578, and Ex. 33.

{¶ 62} Bruce returned from vacation about a week after Jack resigned and described the scene as "havoc" and a "mess." Trial Tr. at p. 213 and p. 232. Various paralegals and both Bruce and Fred spent considerable time dealing with the aftermath of Jack's departure. This related to many calls from clients, insurance companies, and courts; the fact that files were not in order; the fact that there were unfiled documents and checks; the failure of Jack and Michelle to keep Prevail updated; and a lack of awareness that Jack had been using the N drive for his cases. *Id.* at p. 99, 100, 103-104, 211-212, 216, 218, 219-220, 233-234, 237, 427-428, 432, and 704.[3] In addition, a new attorney did not take Jack's place at the firm until July 5, 2017. *Id.* at p. 66.

{¶ 63} On June 6, 2017, HNB filed a complaint against Jack, John, Chris, and C&H. The complaint contained seven causes of action, including: (1) violation of Ohio's Uniform Trade Secrets Act; (2) interference with engagement agreements; (3) interference with business relationships; (4) unjust enrichment; (5) breach of the 2012 Agreement; (6) breach of the 2014 Agreement; and (7) fraudulent concealment. All the claims were asserted against Jack, and Counts One through Four and Seven were

---

[3] The extent of effort required was disputed, and Jack and Michelle denied that information could not be found. Trial Tr. at p. 691, 745, and 770.

asserted against John, Chris, and C&H. *See* Complaint. On the same day, a motion for a temporary restraining order ("TRO") was filed, and Fred filed an affidavit in support of the motion averring that the allegations in the complaint were true.

{¶ 64} On June 7, 2017, the trial court requested a visiting judge, and one was appointed on June 28, 2017. On July 7, 2017, John, Chris, and C&H filed an answer and counterclaim against HNB and a third-party complaint against Fred. *See* Answer, Counterclaim, and Third-Party Complaint. The counterclaim and third-party complaint asserted claims for defamation and false light and were based on articles that had been published in the Dayton Daily News newspaper about a "midnight raid" that had occurred at HNB.

{¶ 65} On July 7, 2017, Jack, John, Chris, and C&H ("Defendants") also filed a motion to dismiss and/or stay all proceedings pending arbitration. The motion was based on the contention that Prof.Cond.R. 1.5(f) required HNB to submit fee disputes to arbitration. In addition, Defendants filed a Civ.R. 12(B)(6) motion to dismiss, and HNB responded to both motions.

{¶ 66} During an August 3, 2017 TRO hearing, the parties agreed to submit an order, but failed thereafter to agree on one. As a result, on August 23, 2017, the trial court filed an order referring the attorney fee dispute part of the case to mediation or arbitration before the Dayton Bar Association ("DBA") in accordance with Prof.Cond.R. 1.5 and the Rules and Procedures of the Dayton Bar Association for Resolution for Fee Disputes and Withdrawals. *See* Order (Aug. 23, 2017), p. 1. The court further ordered that any fees that had been collected or would be collected from clients who had entered into discussions with Jack before August 6, 2017, should be given to John Ruffalo, DBA

counsel, for deposit in an interest-bearing account. *Id.* at p. 1-2. In addition, the court stayed all other matters, including the tort and contract claims, until receipt of Ruffalo's report and further court order. *Id.* at p. 3.

**{¶ 67}** The arbitration was held on March 6, 2018, and a decision was issued on March 15, 2018. Defendants then filed a motion asking the court to confirm the arbitration award. Motion to Confirm (Mar. 19, 2018). HNB responded with a motion to vacate the award, alleging that the arbitrators had exceeded their authority. Motion to Vacate (Apr. 2, 2018), p. 2. Defendants then responded to this motion and also asked the court to order that the arbitration decision be sealed. On April 6, 2018, the court ordered that Ex. D (the arbitration decision), which had been attached to HNB's motion to vacate, be sealed. Ultimately, on April 20, 2018, the court confirmed the arbitration award and also granted Defendant's motion to strike HNB's motion to vacate. After this decision, a number of motions were filed, including HNB's motion asking the court to reconsider its decision on the motion to strike.

**{¶ 68}** As a result, the court issued an order on June 6, 2018, resolving the pending motions. *See* Order on Pending Motions. The court rejected reconsideration of its decision to vacate HNB's motion, because HNB had violated the page limits on motions and had also violated the DBA Committee's confidentiality provisions for resolving disputes. *Id.* at p. 1. The court then granted HNB's motion to resume proceedings, but noted that discovery would only be allowed on the fifth, sixth, and seventh claims (breaches of the 2012 and 2014 agreements and fraudulent concealment), as well as the punitive damages claims, because, in the court's opinion, the arbitration decision had resolved HNB's first four claims for relief. *Id.* at p. 2.

{¶ 69} On June 15, 2018, Jack filed an answer as well as a counterclaim and third-party complaint against Fred, asserting claims of defamation and false light. HNB and Fred then filed answers to the counterclaims and third-party complaints of all Defendants. In August 2018, all Defendants filed motions for summary judgment, but Jack's motion was filed separately. Appellees' motion for summary judgment did not address the counterclaims; they only asked for judgment regarding the fifth, sixth, and seventh counts of the complaint.

{¶ 70} All Defendants filed amended summary judgment motions on October 31, 2018, again with Jack filing separately; on the same day, HNB filed a summary judgment motion. After responses were filed, the trial court granted Jack's motion in part and denied it in part; likewise, the court granted HNB's summary judgment motion in part and denied it in part. *See* Orders Addressing Motions for Summary Judgment (Dec. 31, 2018). Specifically, the court concluded that Jack had violated the notice provision of the contract. In addition, the court restored the trade secrets claim and also concluded that issues of fact existed concerning that claim. The court, however, granted Jack summary judgment on the seventh claim for relief, concluding that this claim involved negligence, conversion, and estoppel. Order Addressing Plaintiffs' Motion for Summary Judgment, p. 2.

{¶ 71} On January 31, 2019, Defendants appealed from the trial court's summary judgment order, and HNB cross-appealed on February 8, 2019. However, the appeal was dismissed for lack of a final appealable order on May 9, 2019, and the case was returned to the trial court. *See Horenstein, Nicholson, and Blumenthal, LPA v. Hilgeman*, 2d Dist. Montgomery No. 28285 (Decision & Final Judgment Entry, May 9, 2019).

{¶ 72} Before the appeal was taken, the trial court had set trial for August 19, 2019. On August 13, 2019, Defendants filed a motion asking the court to clarify the claims set for trial. On the same day, they also asked the court to rule on the previously-filed summary judgment motions of John, Chris, and C&H. HNB then responded to these motions.

{¶ 73} On August 19, 2019, the trial court filed an amended order noting that the claims remaining for trial were the breach of contract claims against Jack, the misappropriation of trade secrets and fraud claims (Count Seven) against all defendants, and the counterclaims and third-party claims for defamation and false light against HNB and Fred. *See* Amended Order (Aug. 19, 2019), p. 2.[4] The court then held a five-day bench trial beginning on August 19, 2019, and ending on August 23, 2019. At the end of HNB's case, the court dismissed the trade secret and fraud claims against John, Chris, and C&H. Trial Tr. at p. 680 and 684. In addition, the court dismissed the breach of contract claim in Count Five based on the 2012 contract, finding that it was superseded by the 2014 contract. *Id.* at 680.

{¶ 74} After the trial, both sides filed post-trial briefs. The court then issued its Findings of Fact, Conclusions of Law and Judgment. Judgment (Oct. 22, 2019). The court found in Jack's favor on the trade secrets claim and against him on the breach of contract claim. Further, the court found in favor of John and Chris on the defamation and false light claims against HNB, but not against Fred. The court also rejected Jack's claims for defamation and false light against HNB and Fred.

---

[4] Concerning Count Seven, the court changed its mind and decided that it stated a claim for fraud, rather than conversion, estoppel, and negligence.

{¶ 75} The court awarded HNB $21,672 in damages for economic loss, but deducted the amount the firm would have had to pay Jack and his paralegal during the time in question, for a total award of $12,911.   Finally, the court awarded John and Chris $200,000 plus court costs on the defamation and false light claims.   No damages were awarded to C&H, as it was regarded as a nonentity.

{¶ 76} On October 22, 2019, HNB filed a notice of appeal from the court's judgment.   The appeal was then docketed as Case No. 28581.   The trial court also filed an order on November 4, 2019, clarifying that the award to John and Chris was a lump sum judgment to be divided equally.   See Order Clarifying Judgment.

{¶ 77} While the case was on appeal, Appellees filed a motion in the trial court on November 5, 2019, seeking prejudgment and post-judgment interest.   They also filed a motion on November 20, 2019, asking the trial court to award them attorney fees and costs/expenses.   The motion was based on R.C. 2323.51 and requested attorney fees, costs, and expenses against both HNB and its counsel, Craig Matthews.

{¶ 78} On November 25, 2019, John, Jack, and C&H filed a motion to dismiss the appeal in Case No. 28581 for lack of a final appealable order, because the trial court had not decided the post-judgment motions.   We concluded that a final appealable order did exist, but elected to remand the case so that the court could resolve the pending post-judgment matters.   See Horenstein, Nicholson, and Blumenthal, LPA v. Hilgeman, 2d Dist. Montgomery No. 28581 (Decision & Entry, Jan. 29, 2020).

{¶ 79} The trial court subsequently set a hearing on the motions for May 20, 2020.   After the hearing, the court filed a judgment entry granting John and Chris prejudgment interest on $200,000 at the statutory rate from September 28, 2018; post-judgment

interest at the statutory rate; attorney fees in the amount of $152,548.40; and necessary expenses of $10,053. The court awarded the attorney fee and cost sanctions against both HNB and Matthews. *See* Order Granting Interest and Fees (June 9, 2020).

**{¶ 80}** On July 1, 2020, Matthews filed a notice of appeal from the court's decision, and the appeal was docketed as Case No. 28838. HNB filed an amended notice of appeal in the existing appeal (Case No. 28581) on July 1, 2020. We consolidated the appeals on August 28, 2020.

**{¶ 81}** With the above facts in mind, we turn to the assignments of error that the parties have presented. For purposes of convenience, we will consider the assignments of error out of order.

## II. Defamation and False Light

**{¶ 82}** HNB's First Assignment of Error states that:

> The Trial Court Erred in Awarding an Affirmative Judgment on the Defamation and False Light Claims.

**{¶ 83}** Before we consider this assignment of error, we note that the only parties to the appeal are Appellants HNB and Matthews and Appellees John and Chris. Jack did not appeal either the damages judgment against him or the denial of his defamation and false light claims. Additionally, John and Chris did not appeal from the judgment in favor of Fred on their defamation and false light claims. Finally, C&H did not appeal any of the trial court's judgments.

### A. Admission of Evidence

{¶ 84} Under this assignment of error, HNB first contends that the defamation and false light claims should have failed on the merits because no evidence was admitted about the content of the alleged defamatory articles. In response, Appellees argue, first, that we should not consider this issue because HNB failed to comply with App.R. 12 and App.R. 16. In this regard, Appellees note that the title of the first assignment of error pertains to sufficiency while the claim is whether the trial court erred by admitting evidence. We would suggest that if the only evidence to support a judgment has been improperly admitted, the judgment would not be based on sufficient evidence.

{¶ 85} Turning to the merits of the argument, HNB contends that Defendant's Ex. Q, which demonstrated the content of the alleged defamation or untrue statements, was not identified by any witness and was not self-authenticating under Evid.R. 901(A).

{¶ 86} The rule "is well established that a trial court's decision to admit evidence is an evidentiary determination within the broad discretion of the trial court and subject to review on an abuse-of-discretion standard." *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, 972 N.E.2d 528, ¶ 19. The abuse of discretion must also create "material prejudice." *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, ¶ 43, citing *State v. Issa*, 93 Ohio St.3d 49, 64, 752 N.E.2d 904 (2001). An abuse of discretion " 'implies that the court's attitude is unreasonable, arbitrary or unconscionable.' " (Citations omitted.) *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). "[M]ost instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). "A decision is unreasonable if there is no sound reasoning process

that would support that decision."   *Id.*

{¶ 87} Defendant's Ex. Q was an article allegedly published on the website of the Dayton Daily News ("DDN") on June 12, 2017.   HNB is correct in stating that no witness specifically identified this exhibit, and the trial court noted this fact.   Trial Tr. at p. 873. However, the court chose to admit the exhibit because Jack referred to the article during his testimony.   *Id.*

{¶ 88} Evid.R. 901(A) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."   One way this can be established is "[t]estimony that a matter is what it is claimed to be."   Evid.R. 901(B)(1).

{¶ 89} While there was no specific testimony at trial that Ex. Q was "what it is claimed to be," Jack identified a similar exhibit (Defendant's Ex. R) as a screenshot of the twitter account of Mark Govaki, who worked at the time for the DDN.   Trial Tr. at p. 772. The "tweet" said "Attorney sued for 'weekend raid' of clients, joining new firm," and it had an incomplete link to an article at daytondailynews.com.   *Id.* at Ex. R.   The tweet was accompanied by a picture that Jack identified as being a picture of him, and Jack identified the picture as one that Govaki had placed next to the first article he wrote immediately after the complaint was filed.   *Id.* at p. 772 and 774.

{¶ 90} Other testimony established that four articles were published: the first was on June 12, 2017; a second, after John and Chris filed their answer and counterclaim; a

third in August 2017, and a fourth in April 2018. *Id.* at p. 818-819 and 859.[5]

**{¶ 91}** Jack also identified Defendant's Ex. U as a screenshot he took of opposing counsel's (Matthews's) Twitter feed, dated June 14, 2017. *Id.* at p. 777. The tweet said "Our client is esteemed law firm exploited in weekend raid of clients, by trusted associate." The tweet also contained the following statements, with a link to daytondailynews.com:

> **Attorney sued for alleged 'weekend raid' of clients, joining . . .**
>
> A local attorney who allegedly conducted a 'weekend raid' of his firm's clients and their information has been sued in Montgomery County Common Pleas.
>
> Mydaytondailynews.com.

(Emphasis sic.) Defendant's Ex. U.

**{¶ 92}** These exhibits contained the same headlines as the article depicted in Ex. Q, The author, Govaki, was also the same author of the article in Ex. Q. In view of the above testimony and evidence, while the better practice would have been to have a witness specifically identify Ex. Q, the evidence was sufficient to conclude that Ex. Q was inferentially identified as what it was claimed to be.

**{¶ 93}** Even if this were otherwise, Evid.R. 902 provides that "Extrinsic evidence of authenticity as a condition precedent to admissibility is not required in certain situations." Among these are "[p]rinted materials purporting to be newspapers or periodicals, including notices and advertisements contained therein." Evid.R. 902(6).

**{¶ 94}** In this context, HNB argues that while newspaper articles may be self-

---

[5] No evidence was presented about the content of the three articles that followed the first, other than that they may or may not have had a picture of Jack accompanying the article. Trial Tr. at p. 818-819.

authenticating, the rule generally only considers print newspapers, not websites, and the "likelihood that a newspaper will be forged . . . is remote." HNB Brief, p. 12, quoting Staff Notes to Evid.R. 902(6). HNB does not suggest why an article on a newspaper's website is any more likely to be forged than a printed article. And, in fact, we were able to locate the same article as Ex. Q on the Dayton Daily News website. *See* https://www.daytondailynews.com/news/crime--law/attorney-sued-for-alleged-weekend-raid-clients-joining-new-firm/JgcdZkREo6UhlWHJxhwlVP/ (accessed July 8, 2021).

{¶ 95} Law in the specific context of printouts from internet websites as self-authenticating is sparse, but some federal courts "have considered the 'distinctive characteristics' of the website in determining whether a document is sufficiently authenticated." *Ciampi v. City of Palo Alto*, 790 F.Supp.2d 1077, 1091 (N.D.Cal. 2011), citing *Premier Nutrition, Inc. v. Organic Food Bar, Inc.*, No. SACV 06-0827 AG (RNBx), 2008 WL 1913163, at *6 (C.D.Cal. Mar. 27, 2008), and *Perfect 10, Inc. v. Cybernet Ventures*, *Inc.*, 213 F.Supp.2d 1146, 1153-1154 (C.D.Cal.2002), *abrogated on other grounds*, as noted in *Fabian Perez Art Publishing LLC v. Las Brujas Inc.*, 2015 WL 11430871, at *4 (C.D.Cal.2015).

{¶ 96} In *Ciampi*, the court allowed admission of printouts where the articles contained "sufficient indicia of authenticity, including distinctive newspaper and website designs, dates of publication, page numbers, and web addresses." *Id.* *But see Specht v. Google Inc.*, 758 F.Supp.2d 570, 582 (E.D.Ill.2010) ("a printout from a website does not require the same work or expense as a printed publication, and as an electronic file, it can be easily manipulated. It lacks the same degree of authenticity as its printed

counterpart.").[6]

{¶ 97} Here, Defendant's Ex. Q contained a URL that led to the article in question, as well as the date of printing, indicia identifying the Dayton Daily News as the source, and links to other local stories in the Dayton area.   Moreover, as noted, our own internet search using the URL in Ex. Q found the same article.

{¶ 98} Accordingly, we conclude that the trial court did not abuse its discretion in admitting Ex. Q into evidence.


### B.   Privilege Relating to Legal Proceedings

{¶ 99} HNB also contends that Defendants' defamation and false light claims were barred by the absolute privilege that attaches to statements made during judicial proceedings.

{¶ 100} The trial court's decision appears to have found defamation due to the allegations in the complaint (which were based on "information and belief"), coupled with the fact that Fred's affidavit in support of the motion for a TRO swore that the allegations in the complaint were true.   Judgment (Oct. 22, 2019), at p. 14-15.   In this regard, the court concluded that the allegations in the complaint were "entirely false, totally unsupported by probable cause, and made with reckless disregard of the truth."   *Id.* at p. 15.   This conclusion was based on these facts: "Cowan and John Hilgeman practice law together, but are not true partners.   They share office expenses, but each is responsible for his own clients and each derives income from those respective clients.   When Jack

---

[6] We disagree with the observation in *Specht.*   A printout is not an electronic file that can be manipulated, and unless someone hacks into a newspaper's website (which is unlikely), we see no way that the content of a published article could be altered.

Hilgeman joined them, it was on the same basis. Neither Cowan, nor John Hilgeman, nor the firm of Cowan and Hilgeman profited from Jack Hilgeman's clients or client lists."

*Id.*

{¶ 101} Although the court recognized that an absolute privilege attaches to statements made during judicial proceedings, the court concluded that HNB waived this privilege by transmitting the alleged defamatory material to a reporter.[7] Although there was no direct evidence of this fact, the court relied on these facts: (1) a picture of Jack accompanied the article and could only have come from within the firm; (2) Bruce incorrectly stated in responding to a request for admissions that the picture was available on the internet; and (3) although the reporter may have possibly found the complaint in a routine sweep of courthouse filings, it was "more probable that the Complaint was supplied by counsel for Plaintiff, given his propensity to go public between the short time period between the filings and the tweet, or the Plaintiff." *Id.* at p. 19. This latter statement was based on the court's prior factual finding that HNB's counsel tweeted out two days after the complaint and TRO were filed that " 'Our client . . . exploited in weekend raid of clients by trusted associate.' " *Id.* at p. 16.

{¶ 102} However, this particular factual finding was incorrect. The complaint was

---

[7] In their brief, Appellees argue that HNB waived the privilege by failing to raise it in its answer to the counterclaims. Appellees' Brief, p. 14-15. However, HNB discussed the matter during the bench trial. Trial Tr. at 908-912. When Appellees responded, they objected that the matter had not been raised during witness examination but did not mention affirmative defenses. Appellees further suggested, not as a bar, but as a legal position, that HNB was incorrect in maintaining that pleadings "cannot be used as claims for defamation." *Id.* at p. 943. In addition, the trial court's waiver decision was not based on waiver of an affirmative defense. We therefore conclude that the issue was properly raised and before the court, which was well-acquainted with the issues after three years of litigation, and also conducted a bench trial.

filed on June 6, 2017; the DDN article was published on June 12, 2017; and the tweet occurred on June 14, 2017, two days after the article appeared. *See* Defendants' Exs. D and U. Furthermore, much attention was paid at trial to the fact that Jack's picture accompanied the article and to where the picture came from, and so on. We find this irrelevant. Assuming that HNB provided the picture, it was equally likely that the reporter asked for a picture to accompany the article. Since the complaint (and the article) were primarily about Jack, it is reasonable that a reporter would want a picture.

{¶ 103} In addition, the picture was not of either John or Chris and had little relevance to their defamation and false light claims. There was nothing untruthful about the picture; it was simply a photo.

{¶ 104} " 'In Ohio, defamation occurs when a publication contains a false statement "made with some degree of fault, reflecting injuriously on a person's reputation, or exposing a person to public hatred, contempt, ridicule, shame or disgrace, or affecting a person adversely in his or her trade, business or profession.' " *Am. Chem. Soc. v. Leadscope, Inc.*, 133 Ohio St.3d 366, 2012-Ohio-4193, 978 N.E.2d 832, ¶ 77, quoting *Jackson v. Columbus*, 117 Ohio St.3d 328, 2008-Ohio-1041, 883 N.E.2d 1060, ¶ 9. (Other citation omitted.) " 'To establish defamation, the plaintiff must show (1) that a false statement of fact was made, (2) that the statement was defamatory, (3) that the statement was published, (4) that the plaintiff suffered injury as a proximate result of the publication, and (5) that the defendant acted with the requisite degree of fault in publishing the statement.' " *Id.*, quoting *Pollock v. Rashid*, 117 Ohio App.3d 361, 368, 690 N.E.2d 903 (1st Dist.1996).

{¶ 105} Plaintiffs in defamation cases may fall within one of four classifications:

private persons, public officials, public figures, or limited purpose public figures. *Talley v. WHIO TV-7*, 131 Ohio App.3d 164, 169, 722 N.E.2d 103 (2d Dist.1998). In the case before us, there was no indication that John and Chris were anything other than private persons.

{¶ 106} "In Ohio, in a case involving a private person who was allegedly defamed in a statement about a matter of public concern, the plaintiff 'has the burden of proving both that the statement was false and [that] the defendant was at least negligent in publishing it.' " *Anderson v. WBNS-TV, Inc.*, 158 Ohio St.3d 307, 2019-Ohio-5196, 141 N.E.3d 192, ¶ 8, quoting *Dale v. Ohio Civil Serv. Emps. Assn.*, 57 Ohio St.3d 112, 114, 567 N.E.2d 253 (1991). "Moreover, the negligence must be proved by clear and convincing evidence." *Id.*, citing *Lansdowne v. Beacon Journal Pub. Co.* 32 Ohio St.3d 176, 180, 512 N.E.2d 979 (1987).[8] *See also Dale* at 114; *McPeek v. Leetonia Italian-Am. Club*, 174 Ohio App.3d 380, 2007-Ohio-7218, 882 N.E.2d 450, ¶ 11 (7th Dist.).

{¶ 107} As indicated, the judgment against HNB was also based on false light, which was recognized as an actionable tort in Ohio in 2007. *Welling v. Weinfeld*, 113 Ohio St.3d 464, 2007-Ohio-2451, 866 N.E.2d 1051, ¶ 61. The elements of this tort are as follows:

> One who gives publicity to a matter concerning another that places
> the other before the public in a false light is subject to liability to the other

---

[8] In *Anderson*, the court noted that while *Lansdowne* was not a majority opinion, "a year after it was decided, a majority of the court acknowledged that the clear-and-convincing-evidence standard set forth in *Lansdowne* was the appropriate standard of proof." *Anderson*, 158 Ohio St.3d 307, 2019-Ohio-5196, 141 N.E.3d 192, at ¶ 8, citing *Oney v. Allen*, 39 Ohio St.3d 103, 106, 529 N.E.2d 471 (1988), fn. 2.

for invasion of privacy if (a) the false light in which the other was placed would be highly offensive to a reasonable person and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed. (Restatement of the Law 2d, Torts (1977), Section 652E, adopted.)

*Id.* at syllabus.

{¶ 108} The Supreme Court of Ohio did not articulate a standard of proof, but "[t]he Restatement's use of the language 'knowledge or ... reckless disregard as to the falsity' reflects the view taken by the Supreme Court of the United States in *Time, Inc. v. Hill*, 385 U.S. 374, 389-90, 87 S.Ct. 534, 542-43, 17 L.Ed.2d 456, 467-68 (1967)." *Colbert v. World Pub. Co.*, 1987 OK 116, 747 P.2d 286, 290 (1987). *Accord Talley v. Time, Inc.*, 923 F.3d 878, 895 (10th Cir.2019).

{¶ 109} In *Hill*, the court held that "the constitutional protections for speech and press preclude the application of the New York statute to redress false reports of matters of public interest in the absence of proof that the defendant published the report with knowledge of its falsity or in reckless disregard of the truth." *Hill* at 387-388.

{¶ 110} In *Welling*, the Supreme Court of Ohio further elaborated on the elements of false light, stating that:

First, the statement made must be untrue. Second, the information must be "publicized," which is different from "published":

" 'Publicity,' as it is used in this Section, differs from 'publication,' as that term is used * * * in connection with liability for defamation. 'Publication,' in that sense, is a word of art, which includes any

communication by the defendant to a third person. 'Publicity,' on the other hand, means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge. The difference is not one of the means of communication, which may be oral, written or by any other means. It is one of a communication that reaches, or is sure to reach, the public." Restatement of the Law 2d, Torts, Section 652D, Comment a.

Another element of a successful false-light claim is that the misrepresentation made must be serious enough to be highly offensive to a reasonable person:

*Welling*, 113 Ohio St.3d 464, 2007-Ohio-2451, 866 N.E.2d 1051, at ¶ 52-54.

**{¶ 111}** HNB contends that the trial court erred because statements made in judicial proceedings are absolutely privileged. In this regard, the Supreme Court of Ohio has said that:

As a matter of public policy, under the doctrine of absolute privilege in a judicial proceeding, a claim alleging that a defamatory statement was made in a written pleading does not state a cause of action where the allegedly defamatory statement bears some reasonable relation to the judicial proceeding in which it appears.

*Surace v. Wuliger*, 25 Ohio St.3d 229, 495 N.E.2d 939 (1986), at syllabus. *See also Reister v. Gardner*, Ohio Slip Opinion No. 2020-Ohio-5484, ___ N.E.3d ___, ¶ 10 (affirming the court's "long-established rule that the litigation privilege provides absolute

immunity from civil suits for defamatory *statements* made during and relevant to judicial proceedings" (Emphasis sic.)).

{¶ 112} In *Surace*, the court stated that the rule applies to both parties and non-parties, even if the nonparty is deprived of a remedy, stressing that "public policy necessitates free and unencumbered exchange of statements in judicial proceedings in order to assist courts in the truth-seeking process." *Id.* at 234. The court went on to emphasize that:

"Although the result may be harsh in some instances and a party to a lawsuit may possibly be harmed without legal recourse, on balance, a liberal rule of absolute immunity is the better policy, as it prevents endless lawsuits because of alleged defamatory statements in prior proceedings. Sufficient protection from gross abuse of the privilege is provided by the fact that an objective judge conducts the judicial proceedings and that the judge may hold an attorney in contempt if his conduct exceeds the bound of legal propriety or may strike irrelevant, slanderous or libelous matter."

*Id.*, quoting *Justice v. Mowery*, 69 Ohio App.2d 75, 77, 430 N.E.2d 960 (10th Dist.1980).

{¶ 113} This absolute privilege also applies to witnesses (such as Fred), who "must be permitted to testify without fear of consequences. Freedom of speech in a judicial proceeding is essential to the ends of justice." *Willitzer v. McCloud*, 6 Ohio St.3d 447, 449, 453 N.E.2d 693 (1983).

{¶ 114} In responding to HNB's argument, Appellees contend that providing a complaint to a newspaper has no reasonable connection to judicial proceedings and therefore was not privileged. This somewhat misconstrues the issue, however. The

trial court concluded that these allegations in the complaint, coupled with Fred's affidavit attesting to their truth, were defamatory.   Judgment (Oct. 22, 2019), at p. 14-15.   The allegations in question, as recited by the court, accused John and Chris of " 'actively assisting and participating in a weekend raid of information contained in the Firm's confidential files,' and of 'enjoying the ill-begotten fruits' of this unlawful behavior as well as the 'willful and malicious appropriation of trade secrets.' "   *Id.* at p. 14.   Our initial inquiry, therefore, is focused on the complaint and affidavit, and whether an actionable claim existed in that regard.

{¶ 115} Having reviewed the complaint and affidavit, it is unquestionable that the allegations bore a reasonable relation to the judicial proceeding, which was brought on the basis of breach of contract, interference with businesses and contractual relationships, trade secrets, and fraud, all relating to Jack's departure from HNB and joining John and Chris at C&H.   Whether those claims ultimately succeeded was irrelevant; the alleged defamatory statements were reasonably related to the proceeding under any interpretation, and, therefore, were absolutely privileged.

{¶ 116} In concluding that HNB could, nonetheless, be held liable, the trial court relied on out-of-state authority, which held that transmitting defamatory material to a reporter either is not subject to the litigation privilege or waives it.   *See* Judgment at p. 18, citing *Bochetto v. Gibson*, 580 Pa. 245, 860 A.2d 67 (2004), and *Helena Chem. Co. v. Uribe*, 149 N.M. 789, 2011-NMCA-060, 255 P.3d 367 (Ct.App. 2011) (*Helena I*).[9] Appellees concede that they have been unable to find Ohio authority allowing for such a

---

[9] The decision in *Helena* was reversed on appeal to the New Mexico Supreme Court. *See Helena Chem. Co. Co. v. Uribe*, 2012-NMSC-021, 281 P.3d 237 (2012) (*Helena II*).

waiver.   Appellee's Brief at p. 18.

{¶ 117} In *Bochetto*, an attorney (Bochetto) was sued for legal malpractice based on two real estate cases that he lost while representing Pickering Hunt ("Pickering"). *Bochetto* at 248-249.   After filing the malpractice complaint, Pickering's attorney, Gibson, faxed a copy of the complaint to a reporter, who then wrote an article about the complaint that was published in a local legal publication.   *Id.* at 249.   The article also included statements from both Bochetto and Gibson concerning the lawsuit.   *Id.* at 249, fn.6.

{¶ 118} After the article was published, Bochetto sued Gibson and his law firm for defamation, and the defendants then filed a motion for summary judgment, based on absolute privilege.   The trial court granted summary judgment for the defendants, concluding that Gibson's act of sending the complaint was protected by absolute privilege because Gibson sent it after the complaint was filed.   *Id.* at 249-250.   On further appeal, the trial court's judgment was affirmed, and Bochetto then appealed to the Pennsylvania Supreme Court.   *Id.* at 250.

{¶ 119} In a very brief opinion, the Pennsylvania Supreme Court concluded that while the complaint was protected by absolute privilege, this privilege can be lost through "overpublication."   *Id.* at 253, citing *Pawlowski v. Smorto*, 403 Pa.Super. 71, 81, 588 A.2d 36 (1991).   The court then held that Gibson's act of sending the complaint to a reporter was a "republication," which "was an extrajudicial act that occurred outside of the regular course of the judicial proceedings and was not relevant in any way to those proceedings." *Id.*

{¶ 120} Other jurisdictions disagree. For example, in the decision of the New Mexico Supreme Court in *Helena II*, the court held that "statements made by litigants or

their attorneys to the press after the lawsuit has been filed are absolutely privileged if the statements are a repetition or an explanation of the allegations in the pleading." *Helena II* at ¶ 2.[10] In that case, a chemical company filed a defamation complaint against an attorney and her client, alleging that defamatory comments were made during a public meeting held ten months before suit was filed against the company and in a press conference the attorney held the day after suit was filed. *Id.* at ¶ 5, 7, and 8. The trial court granted summary judgment for the defendants, applying absolute privilege. However, the court of appeals reversed, because the statements "were made in the presence of the press, who did not have a relationship to or interest in the judicial proceeding." *Id.* at ¶ 10, citing *Helena I*, 149 N.M. 789, 2011-NMCA-060, 255 P.3d 367, at ¶ 33.

{¶ 121} Regarding post-filing statements, the Supreme Court of New Mexico rejected the lower court's opinion that "republishing, repeating, or explaining a complaint that was filed in good faith" removes the absolute privilege. In this regard, the court stressed that:

"In the age of digital communication, it is illogical to protect allegations in a publicly filed complaint but not repetition or explanation of those same allegations outside the courthouse. Allegations of interest to the public or even to a single competitive industry will inevitably reach interested parties, and an explanation limited to the scope of the complaint only narrows the potential harm of statements that would be defamatory but

---

[10] In addition, the court held that litigation statements are absolutely privileged in certain circumstances, which the court found present in the case before it. *Helena II* at ¶ 2.

for the privilege."

*Helena II* at ¶ 30, quoting *PowerDsine, Inc. v. AMI Semiconductor, Inc.*, 591 F.Supp.2d 673, 684 (S.D.N.Y.2008).

{¶ 122} The court further stressed that " '[t]he harm resulting to a defamed party from delivery of pleadings in a lawsuit to the news media could demonstratively be no greater than if the news media found the pleadings on their own' and 'advising the media that a lawsuit has been filed, including a basic description of the allegations, has no practical effect different from providing the pleadings to the media.' " *Id.* at ¶ 32, quoting *Dallas Indep. School Dist. v. Finlan*, 27 S.W.3d 220, 229 (Tex. App.2000).[11]

{¶ 123} Sound policy reasons exist for both positions on this issue. For the reasons discussed in *Helena II*, removing the privilege for simply transmitting a complaint and explaining the litigation would undermine the policy supporting the litigation privilege, especially when the information disclosed is a matter of public record anyway. On the other hand, extending an absolute privilege too far beyond the litigation process also poses issues.

{¶ 124} Because the Supreme Court of Ohio has not ruled on this point, we are left to anticipate what the court might do. For this analysis, we turn to the decision of the Ohio Supreme Court in *Am. Chem. Soc.*, 133 Ohio St.3d 366, 2012-Ohio-4193, 978 N.E.2d 832. In that case, a dispute arose between a chemical abstract company (a

---

[11] In a very recent decision, the Texas Supreme Court settled a split in lower court cases and disapproved of the position taken in *Finlan*. *Landry's, Inc. v. Animal Legal Defense Fund*, ___ S.W.3d ___, 2021 WL 2021130, *8 (Tex. S.Ct. May 21, 2021). In doing so, the court noted that "[t]he widely adopted rule in other American jurisdictions is that neither the judicial-proceedings privilege nor attorney immunity protects attorneys who publicize to the media or to others unconnected with the proceeding allegations that would have been privileged within the proceeding." *Id.* at *8, fn. 13.

division of the American Chemical Society ["ACS"]) and its former employees over whether the employees had improperly used code that had been created while they worked at the company developing software. *Id.* at ¶ 2-6. When negotiations were at an impasse, ACS filed suit against the former employees and Leadscope (the company they had formed). *Id.* at ¶ 7.

{¶ 125} On the day the litigation was filed, a legal administration manager and another manager at ACS circulated a memorandum to all its employees explaining that the lawsuit had been filed and instructing employees not to comment on the matter during the litigation. *Id.* Ten days later, an article appeared in a local business newspaper. "The article quoted ACS's outside counsel as follows: 'Our motivation in filing suit is to acquire back the protected information that they took from us.' The article described both the allegations in the complaint and Leadscope's response, including a statement from [one of the former employees] that the lawsuit 'has no merit' and a quote from Leadscope's counsel that '[t]he timing of this lawsuit [days before Leadscope was to close a venture-capital deal] speaks volumes as to its invalidity.' " *Id.* at ¶ 8.

{¶ 126} Although the litigation was originally filed in federal court, ACS dismissed the action and refiled in state court. In responding to the complaint, the defendants filed a counterclaim based on various grounds, including defamation. *Id.* at ¶ 9-10. A jury trial then resulted in a judgment against ACS on its claims and a judgment in favor of the defendants on some of their counterclaims (tortious interference, unfair competition and defamation). *Id.* at ¶ 15. The court of appeals then affirmed the judgment. *Id.* at ¶ 16. On further appeal, the Supreme Court of Ohio reversed the part of the appellate judgment upholding the defamation judgment against ACS and the damage award on that

judgment. *Id.* at ¶ 95.

{¶ **127**} In discussing the defamation claim, the court did not specifically address the republication issue as articulated in *Helena II* and *Finlan*. After noting the elements of defamation, the court commented that " '[i]t is for the court to decide as a matter of law whether certain statements alleged to be defamatory are actionable or not.' " *Am. Chem. Soc.*, 133 Ohio St.3d 366, 2012-Ohio-4193, 978 N.E.2d 832, at ¶ 78, quoting *Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 6 Ohio St.3d 369, 372, 453 N.E.2d 666 (1983). The court then said that " '[i]n determining whether a statement is defamatory as a matter of law, a court must review * * * the totality of the circumstances' and by 'read[ing] the statement[ ] * * * in the context of the entire [publication] to determine whether a [reasonable] reader would interpret [it] as defamatory.' " *Id*. at ¶ 79, quoting *Mann v. Cincinnati Enquirer*, 1st Dist. Hamilton No. C-09074, 2010-Ohio-3963, ¶ 12. (Other citations omitted.)

{¶ **128**} In this context, the Supreme Court of Ohio concluded that the memorandum to ACS employees was not defamatory as a matter of law and was not actionable because it simply directed employees not to discuss the litigation and distributing a memo to employees on an important legal matter was reasonable. *Id*. at ¶ 81. The court then considered whether the published article was defamatory as a matter of law. *Id*. at ¶ 81-86.

{¶ **129**} In this vein, the court held that the statements in the article were not defamatory as a matter of law and reversed the court of appeals "to the extent it held otherwise." *Id*. at ¶ 86. The supporting reasons included the following items: (1) the article "contained a balanced report of both parties' arguments and defenses"; (2) "[t]he

alleged defamatory statements made by ACS's outside counsel in the article pertained to ACS's intent in filing the lawsuit"; (3) the newspaper "gave the parties an opportunity to comment on the case and, in fact, both parties took advantage of that opportunity"; (4) "The first sentence of the article states that ACS is 'alleging [that Leadscope and its founders] used proprietary information to form and operate their business.' Thus, a reasonable reader would understand that ACS's counsel's statements were a quick summary of the case and ACS's allegations"; and (5) "the lawsuit was not under seal, and the complaint was available to the public. The public has a legitimate, constitutionally protected interest in judicial proceedings, and the article provided information to educate and inform the public about the case." *Id.* at ¶ 81-86.

{¶ 130} While the court held that the statements were not defamatory as a matter of law, it went on to consider the fact that ACS was held liable for comments of its outside counsel. The court noted that this was a matter of first impression. *Am. Chem. Soc.*, 133 Ohio St.3d 366, 2012-Ohio-4193, 978 N.E.2d 832, at ¶ 87. This is of significance in the case before us. As in *Am. Chem. Soc.*, the defamation claim here has been asserted only against the client (HNB), not against either HNB's outside counsel or the newspaper that published the article.

{¶ 131} In deciding to reverse the defamation judgment against the client, the Supreme Court of Ohio made the following observations:

> Although we have not confronted the discrete issue here, courts outside of Ohio have done so. The better reasoned opinions hold that a client may be vicariously liable for its attorney's torts only if the client authorized or ratified the conduct. *See, e.g., Givens v. Mullikin*, 75 S.W.3d

383, 394-396 (Tenn.2002) (an insurer and an insured may be held vicariously liable for the tortious acts or omissions of an attorney hired to defend the insured if the attorney's tortious actions were directed, commanded, or knowingly authorized by the insurer or by the insured); *Chisler v. Randall*, 124 Kan. 278, 259 P. 687, 690 (Kan.1927) ("The client is not responsible for unauthorized defamatory communications made by his attorney"); *Green Acres Trust v. London*, 142 Ariz. 12, 18-19, 688 P.2d 658 (Ariz.App.1983), *vacated in part on other grounds*, 141 Ariz. 609, 688 P.2d 617 (1984) (a client was not liable for defamation when there was an absence of any evidence of either authorization or ratification of the attorneys' statements); *Arigno v. Murzin*, Conn.Super.Ct. No. CV960474102S, 2001 WL 1265404, *9 (Oct. 2, 2001) (a client was vicariously liable for an attorney's statements that went beyond reading charges against the opposing party because the client apparently authorized the statements).

We agree. Based on the foregoing authority, we hold that a client is vicariously liable for its attorney's defamatory statements only if the client authorized or ratified the statements. To hold otherwise would wreak havoc on the bench and bar, as well as clients.

We make clear that Ohio law imposes no blanket prohibition on an attorney's communications to the media. Attorneys and their clients retain a panoply of First Amendment rights and are free to speak to the public about their claims and defenses provided that they do not exceed the

contours of protected speech and ethical rules that impose reasonable and necessary limitations on attorneys' extrajudicial statements. *See* Prof.Cond.R. 3.6 ("A lawyer who is participating or has participated in the investigation or litigation of a matter shall not make an extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of public communication and will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter"). Thus, while we do not muzzle an attorney representing a party in a proceeding, attorneys are not given carte blanche to defame others under the guise of litigation.

*Am. Chem. Soc.*, 133 Ohio St.3d 366, 2012-Ohio-4193, 978 N.E.2d 832, at ¶ 88-90.

**{¶ 132}** While the court did not use the words "waiver," "republication," or "overpublication," the opinion in *Am. Chem. Soc.* does dictate the approach to be followed here. Attorneys are permitted to make statements to outside sources like a newspaper, and a client's liability for such is limited. *Am. Chem. Soc.* says nothing about providing a copy of a complaint to a reporter or other outside source, but given the court's statements, it is hard to imagine that this would be prohibited. As noted, clerks' offices contain public records that anyone can access, unless records are filed under seal.

**{¶ 133}** Applying *Am. Chem Soc.* here, the first issue is whether the statements in the Dayton Daily News article were defamatory as a matter of law. In this regard, the article stated, in pertinent part, as follows:

Attorney sued for **alleged** "weekend raid" of clients, joining new firm

* * *

A local attorney who **allegedly** conducted a "weekend raid" of his firm's clients and their information has been sued in Montgomery County Common Pleas Court.

The law firm of Horenstein, Nicholson & Blumenthal (HN&B) **charge** that Jack R. Hilgeman sent an email of resignation at 8:45 p.m. on Friday, May 5, 2017.

"During the ensuing hours, Hilgeman secretly conducted a 'weekend raid' of information contained in the firm's confidential files, copying the firm's confidential data onto his own devices," the complaint **alleges**.

"Hilgeman then hurriedly and without notice or consent of the firm, used the firm's confidential information to contact the firm's clients for the purpose of inducing them to leave the firm and retain Hilgeman."

* * *

Hilgeman **allegedly** convinced his paralegal - who had knowledge of the filing system with court information - to join him at Cowan & Hilgeman.

HN&B **characterized** that firm's name as fictitious because they **claim** there is no business by that name listed by the Ohio Secretary of State.

* * *

"I see this as a story of greed and deception and how an attorney used the Code of Professional Responsibility to facilitate wrongdoing," said attorney Craig Matthews, who is representing HN&B. "My client is a long-established, highly reputable firm. Their primary focus was protecting the

legal interests of their clients. That is their professional duty.

"Knowing they would honor that duty and not do anything to disrupt their client's cases, the defendant was able to raid the firm after hours."

* * *

The **court filing also includes** a motion for a temporary restraining order and preliminary injunction against Hilgeman, who started at HN&B in 2012.

That **motion seeks** to "immediately freeze all tangible and intangible property that came into his possession during the employment of Jack Hilgeman with the firm and provide a full and complete accounting of all transactions they have undertaken involving the firm's clients since his sudden and abrupt departure."

A woman who answered the phone Friday at Cowan & Hilgeman said she spoke to Jack Hilgeman, and that, "he said he had no comment at this time."

The complaint **said** Hilgeman never expressed any displeasure at work. **A copy of Hilgeman's contract included with the complaint includes language that said** either side is supposed to give a 60-day notice to end the contract.

* * *

The firm **alleges** Hilgeman instead of using the software system he was supposed to, put the client information into "spreadsheets he maintained on folders which he could readily copy."

The complaint also **said** that shortly after joining Cowan & Hilgeman, he "began to harvest settlement proceeds from the cases he had taken" and left HN&B in "chaos."

Defendants include Hilgeman, Christopher Cowan, John P. Hilgeman and Cowan & Hilgeman because they **allegedly** "participated in the conduct above and now enjoy the ill-begotten fruits."

The case was assigned to Judge Mary Kate Huffman, who immediately requested to be disqualified and have an out-of-county visiting judge assigned "due to numerous conflicts with the parties involved." (Emphasis added.) Defendants' Ex. Q at p. 1-3.

**{¶ 134}** Considering the totality of the circumstances and reading the statements in the context of the publication and how a reasonable reader would interpret them, we conclude that the article was not defamatory as a matter of law. First, almost every sentence in the article either quotes the complaint or uses the word "alleged" or similar terms to describe what the complaint was about. The statements of HNB's counsel (Matthews) pertained to HNB's intent in filing the lawsuit. Reasonable readers, therefore, would understand that the statements summarized the case and HNB's allegations.

**{¶ 135}** Furthermore, while the article did not recite the Defendants' point of view, the article was published on June 12, 2017, before the Defendants had filed any statements or pleadings in court. Moreover, when Jack was contacted at C&H's firm phone number, he declined to comment. Jack could have presented a contrary point of view, but chose not to do so. Finally, the lawsuit was not filed under seal, meaning that

the complaint was available to the public.

{¶ 136} Regarding Matthews's tweet of June 14, 2017, we conclude that this statement also was not defamatory as a matter of law. The tweet simply stated "Our client is esteemed law firm exploited in weekend raid of clients, by trusted associate," and it provided a link to the newspaper article. Defendants' Ex. U. Thus, the tweet included nothing more than what was stated in the article. Additionally, the tweet referred only to Jack, not to Chris or John. Jack was the "trusted associate."

{¶ 137} We note, too, the trial court's finding that Jack was not defamed or placed in a "false light" by the newspaper article, because the statements were "somewhat false, but *substantially true*." (Emphasis added.) Judgment (Oct. 22, 2019), at p. 20. And, the C&H firm was dismissed as a "nonentity." Moreover, Matthews's comments in the article were not made about John or Chris; he only referred to "an attorney" in the singular (meaning Jack) and to the weekend raid by the defendant (again in the singular and a clear reference to Jack).

{¶ 138} Even if Matthews's comments had been defamatory, Appellees failed to establish that HNB authorized or ratified his statements. No evidence was presented that HNB authorized Matthews to make the statement in the article or to tweet or provide a link to the article. In addition, there was no evidence that HNB ratified Matthews's statements after the fact. Appellees could have questioned both Bruce and Fred about this, but they failed to do so.

{¶ 139} The only evidence that was elicited from HNB witnesses was that Bruce hired Matthews because Jack refused to deposit the personal injury fees in an independent trust account, but instead insisted on keeping them in his own trust account,

which Bruce found unacceptable. Trial Tr. at p. 412 and 498. The mere fact that a client has hired an attorney does not mean that the client is vicariously liable for what the attorney happens to say, absent, as *Am. Chem. Soc.* said, evidence of authorization to make the statement or ratification of such. We have searched the record strenuously, and there was simply no evidence on this point.

{¶ 140} The trial court appears to have imputed Matthews's statements and actions simply as an agent for HNB. Judgment at p. 19. However, that is not what the Supreme Court of Ohio has mandated. The client must authorize or ratify the making of the defamatory statement, which would require evidence pertinent to those points. Moreover, as we have pointed out, the trial court's facts about the "short period of time between the filings and the tweet" were incorrect. *See id.* at p. 19.

{¶ 141} Appellees' "false light" claim suffered from the same infirmities. Concerning this claim, the trial court concluded that "in leaking the complaint to the Dayton Daily News, Plaintiff acted in reckless disregard of the truth in placing Chris Cowan and John H. Hilgeman in a false light and thereby waived the privileged status that this document, used properly in the judicial process, would otherwise have had." *Id.* at p. 20.

{¶ 142} As we read the decision in *Am. Chem. Soc.*, the absolute privilege for the complaint and affidavit barred the false light claim. *Compare Lasater v. Vidahl*, 2012-Ohio-4918, 979 N.E.2d 828, ¶ 13 (9th Dist.) ("allegations of criminal activity to police officers and [defendant's] letter to a magistrate are entitled to absolute privilege from civil

liability for false light invasion of privacy").[12]   As indicated, the complaint and affidavit were absolutely privileged and were matters of public record.   From the perspective of the allegations made here, there was little difference here between the defamation and false light claims.

{¶ 143} Furthermore, even if there had been a difference, Appellees would have been required to prove that HNB authorized or ratified the "leaking" of the complaint.[13] There was simply no proof that HNB did this.   Much time was devoted at trial to the picture of Jack that accompanied the DDN article and who may have furnished the picture. However, we consider this an irrelevant fact.   The picture was not defamatory; it merely accompanied an article that was almost completely about Jack.

{¶ 144} Appellees could have called the reporter to testify as to who furnished him with the complaint or brought it to his attention.   Jack, who also filed a counterclaim for defamation and false light, stated that he *chose not to subpoena the reporter*.   Trial Tr. at p. 777.   In addition, Appellees did not call the reporter to testify.   They were entitled

---

[12] Other Ohio authority has held that statements to police officers enjoy only qualified immunity.   *See Thomas v. Murry*, 8th Dist. Cuyahoga No. 109287, 2021-Ohio-206, ¶ 56-57 (distinguishing its approach of qualified immunity from the Ninth and Fourth Districts, which allow absolute immunity).   These inconsistent approaches are irrelevant here, however, as this lawsuit does not involve pre-litigation statements.

[13] By making this statement, we are not stating that providing a copy of a complaint to a news source is actionable in Ohio.   We find nothing in *Am. Chem. Soc.* to indicate that this is the case.   If the reporter had simply downloaded the complaint in a "routine sweep," as the trial court mentioned, there would be no basis for a false light or defamation claim, given the absolute privilege for judicial proceedings.   We fail to see how simply handing a copy of the same complaint to a reporter would be any more actionable.   In this regard, *see Pincus v. Pincus*, 2018-Ohio-5231, 127 N.E.3d 393, ¶ 36 (8th Dist.) (judgment on the pleadings granted based on absolute privilege where defendants' counsel provided complaint in prior case to the media and also commented on purpose in filing that complaint against the allegedly defamed parties).

not to do that, but they had the burden of proving their case. *E.g.*, *Welling*, 113 Ohio St.3d 464, 2007-Ohio-2451, 866 N.E.2d 1051, at ¶ 61 (recognizing false light as a tort and establishing required elements); *Dale*, 57 Ohio St.3d at 114, 567 N.E.2d 253 (discussing injured party's burden of proof in defamation actions).

{¶ 145} As a final matter in this context, the trial court applied a legally incorrect standard by finding that Appellees proved all the elements of a defamation claim "by a preponderance of the evidence." Judgment at p. 20. The standard for a defamation claim is that a defendant's negligence must be proved by clear and convincing evidence. *Anderson*, 158 Ohio St.3d 307, 2019-Ohio-5196, 141 N.E.3d 192, at ¶ 8, citing *Lansdowne*, 32 Ohio St.3d at 180, 512 N.E.2d 979. In contrast, the trial court here never mentioned "clear and convincing evidence" other than noting that its finding was not based on this standard. Judgment at p. 20.

{¶ 146} For this reason, even if the above discussion were incorrect, the defamation judgment would have to be reversed. Furthermore, the trial court applied only a preponderance of evidence finding to the false light claim. *Id.* at p. 21. While the court used words like "reckless disregard" in its findings, it specifically stressed that its findings were "based on the preponderance of evidence standard and not the clear and convincing standard." *Id.*

{¶ 147} We have not found a specific discussion in Ohio state cases about the burden of proof of false light. However, federal courts and courts in other states have applied a "clear and convincing" standard. *E.g.*, *Machleder v. Diaz*, 801 F.2d 46, 56 (2d Cir.1986*); Peoples Bank & Tr. Co. of Mountain Home v. Globe Internatl. Pub., Inc.*, 978 F.2d 1065, 1068 (8th Cir.1992), fn. 2 (interpreting Arkansas law); *Ashby v. Hustler*

*Magazine, Inc.*, 802 F.2d 856, 860 (6th Cir.1986) (interpreting Kentucky law); *Parson v. Farley*, 800 Fed.Appx. 617, 623 and fn. 2 (10th Cir.2020) (interpreting Oklahoma law); *Vachani v. Yakovlev*, 2016 WL 7406434, *6 (N.D. Cal.2016) (applying California law); *Mishak v. Serazin*, N.D.Ohio No. 1:17CV1543, 2018 WL 747106, *10 (N.D.Ohio 2018); *Wal-Mart Stores, Inc. v. Lee*, 348 Ark. 707, 742, 74 S.W.3d 634 (2002); *Durando v. Nutley Sun*, 209 N.J. 235, 257, 37 A.3d 449 (2012); *Dodrill v. Arkansas Democrat Co.*, 265 Ark. 628, 639, 590 S.W.2d 840 (1979); *Found. for Behavioral Resources v. W. E. Upjohn Unemp. Trustee Corp.*, 332 Mich.App. 406, 413, 957 N.W.2d 352 (2020) ("malice is an element of false-light invasion of privacy, regardless of whether the plaintiff is a public or private figure"). *But see Graboff v. Colleran Firm*, Civil Action No. 10-1710, 2013 WL 1286662, *3 (E.D.Pa. Mar. 28, 2013) (jury was instructed under a preponderance of evidence standard.); *Dadd v. Mt. Hope Church*, 486 Mich. 857, 780 N.W.2d 763 (2010) (stating, without discussion, that "the trial court properly instructed the jury on false light invasion of privacy, which included an instruction that 'plaintiff must prove by a preponderance of the evidence that the defendant must have known or acted in reckless disregard of the falsity of the information and the false light in which the plaintiff would be perceived.")

{¶ 148} Regardless of the standard applied, the decision in the case before us added confusion by specifically stating that the court was not applying the clear and convincing standard. Nonetheless, this error was harmless because we have already concluded that, under the circumstances of this case, absolute privilege applied to both the defamation and false light claims.

{¶ 149} In light of the conclusion that absolute privilege applied and the failure of

Appellees to prove that HNB authorized or ratified Matthews's statements, the defamation and false light judgments in favor of Appellees must be reversed.

### C.   Truth of the Statements

**{¶ 150}** HNB's next argument is that the defamation and false light claims fail because the published statements were true.   Specifically, the article contained in Ex. Q referred to each statement as "alleged" or words to that effect, which was a truthful presentation.   In other words, the article did not indicate that any statements in the complaint were true; it simply indicated what the alleged claims were – and this, in fact, was true.   Based on our prior discussion, we agree.

**{¶ 151}** A false statement has been defined "as a statement that 'sets forth matters which are not true,' or '[s]tatements without grounds in truth or fact.' * * * A statement is not a 'false statement' if, even though it is misleading and fails to disclose all relevant facts, the statement has some truth in it."   *Serv. Emp. Internatl. Union Dist. 1199 v. Ohio Elections Comm.*, 158 Ohio App.3d 769, 2004-Ohio-5662, 822 N.E.2d 424, ¶ 18 (10th Dist.), quoting *In re Pirko*, 44 Ohio App.3d 3, 5, 540 N.E.2d 329 (10th Dist.1988). Notably, the news article did not say the allegations were true; in fact, the very nature of an allegation is that it may be disputed.

**{¶ 152}** In addition, while Appellees make much of Fred's TRO affidavit verifying that the allegations in the complaint were true, the affidavit was never mentioned in the DDN article or the tweet; the affidavit was simply filed as part of the judicial action, was reasonably related to the issues raised, and was absolutely privileged as part of the proceeding.   The Supreme Court of Ohio has stressed that "[w]hile the imposition of an

absolute privilege in judicial proceedings may prevent redress of particular scurrilous and defamatory allegations that tend to harm the reputation of the person defamed, a contrary rule, in our view, would unduly stifle attorneys from zealously advancing the interests of their clients in possible violation of the Code of Professional Responsibility, and would clog court dockets with a multitude of lawsuits based upon alleged defamatory statements made in other judicial proceedings." *Surace*, 25 Ohio St.3d at 235, 495 N.E.2d 939.

**{¶ 153}** Based on the preceding discussion, HNB's First Assignment of Error is sustained. The October 22, 2019 judgment of the trial court will be reversed as to the judgment on the counterclaims, and the court will be instructed to enter judgment in favor of HNB on those claims. In all other respects, the judgment will be affirmed.

### III. Prejudgment Interest

**{¶ 154}** HNB's third assignment of error states that:

The Trial Court Improperly Awarded Prejudgment Interest.

**{¶ 155}** After the post-judgment hearing, the trial court granted Appellees prejudgment interest on their $200,000 defamation and false light judgment, at the statutory rate from September 28, 2018, because HNB did not make a good faith attempt to settle the case. The motion for prejudgment interest granted pursuant to R.C. 1343.03(C)(1).

**{¶ 156}** In awarding prejudgment interest, the court commented that on August 12, 2019, in the court's presence, Appellees had offered to dismiss their counterclaims in exchange for HNB's dismissal of the claims against them. The court stressed that HNB's attorney had rejected the offer "on the spot." Order Granting Defendants' Motions for

Pre- and Post-Trial Interest and Attorney Fees (June 9, 2020), p. 2. The court then observed that, at the latest, by September 18, 2018, HNB failed to act in good faith in proceeding against Appellees. *Id.* at p. 2-3. The basis for this conclusion was that by then, HNB had taken the depositions of John, Chris, and Jack, and had learned that John and Chris had not assisted Jack with his personal injury practice and had not received any portion of Jack's revenue after he joined C&H. *Id.* at p. 3-4.

**{¶ 157}** R.C. 1343.03(C)(1) allows an award of prejudgment interest "[i]f, upon motion of any party to a civil action that is based on tortious conduct, that has not been settled by agreement of the parties, and in which the court has rendered a judgment, decree, or order for the payment of money, the court determines at a hearing held subsequent to the verdict or decision in the action that the party required to pay the money failed to make a good faith effort to settle the case and that the party to whom the money is to be paid did not fail to make a good faith effort to settle the case * * *."

**{¶ 158}** Because the June 9, 2020 judgment awarding damages to Appellees will be reversed, no prejudgment interest will be statutorily due. Accordingly, the third assignment of error is sustained, and on remand, the trial court will not award prejudgment interest. And, although not specifically raised in an assignment of error, the grant of post-judgment interest under R.C. 1343.03(B) is also no longer warranted, and the trial court will be ordered to proceed accordingly in that regard as well.

## IV. Frivolous Conduct Award

**{¶ 159}** HNB's second assignment of error states that:

The Trial Court Improperly Awarded Frivolous Conduct Damages.

**{¶ 160}** Similarly, Matthews's first assignment of error states that:

The Trial Court Erred in Awarding R.C. 2323.51 Attorney Fees to Cowan and Hilgeman Against Matthews.

**{¶ 161}** Matthews's second assignment of error also provides that:

Even Had Cowan and Hilgeman Proved Matthews Engaged in Frivolous Conduct, the Trial Court Erred in the Amount of Attorney Fees and Expenses Awarded.

**{¶ 162}** Because these assignments of error raise related arguments, we will discuss them together.   HNB argues that it had no reason to settle the defamation and false light claims against it because it objectively believed in good faith that it was not liable due to the absolute privilege for statements made during litigation.   HNB further argues that Appellees failed to present evidence at the hearing that HNB's conduct was frivolous and that an insufficient evidentiary record at trial of a case is not enough to establish frivolous conduct.

**{¶ 163}** Matthews argues that motions for frivolous conduct must be decided on evidence presented at the hearing, not on evidence submitted with the motion or that is in the trial court record.   In this regard, Matthews notes that Appellees did not present any evidence at the hearing other than evidence concerning the attorney fees themselves.   Matthews further argues that the trial court should not have awarded fees for Jack's defense of himself, and that the ratio the court applied was also improper.

**{¶ 164}** In response, Appellees argue that they were forced to defend themselves for several years against claims they had engaged in sneaky and dishonest behavior. They also note that the trial court found, in dismissing the trade secret and fraud claims,

that there was no evidence implicating them in these matters. They further argue that, because trial courts may take judicial notice of the proceedings in the immediate case, no further evidence was required.

{¶ 165} As noted, the trial court concluded that HNB and Matthews had engaged in frivolous conduct and awarded attorney fees to Appellees, and against HNB and Matthews, in the amount of $152,548.50, plus necessary expenses of $10,053. In particular, the court stated that it was making its finding under R.C. 2323.51(A)(2)(a)(ii), which pertains to " 'allegations or other factual contentions that have no evidentiary support.' " Order (June 9, 2020), at p. 4.[14]

{¶ 166} R.C. 2323.51(B)(1) provides that "any party adversely affected by frivolous conduct may file a motion for an award of court costs, reasonable attorney's fees, and other reasonable expenses incurred in connection with the civil action or appeal." As pertinent here, "frivolous conduct" is defined as:

(a) Conduct of an inmate or other party to a civil action, * * * or of the inmate's or other party's counsel of record that satisfies any of the following:

* * *

(iii) The conduct consists of allegations or other factual contentions that have no evidentiary support or, if specifically so identified, are not likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

R.C. 2323.51(A)(2)(a)(iii).

---

[14] The wording in question is actually found in R.C. 2323.51(A)(2)(a)(iii), and we will refer to that subsection during our discussion.

{¶ 167} "The award of attorney fees may be equal to or less than, but may not exceed, the attorney fees that were reasonably incurred by the aggrieved party." *Foland v. Englewood*, 2d Dist. Montgomery No. 22940, 2010-Ohio-1905, ¶ 65, citing R.C. 2323.51(B)(3). "The court may order the sanction to be paid by a party, a party's counsel of record, or both." *Id.* citing R.C. 2323.51(B)(4)." In addition, "[t]he party seeking sanctions under R.C. 2323.51 bears the burden of establishing the costs incurred in connection with the frivolous conduct and reasonable attorney fees that it incurred." *Id.* at ¶ 66, citing *In re Verbeck's Estate,* 173 Ohio St. 557, 559, 184 N.E.2d 384 (1962).

{¶ 168} The legal standard of review depends on whether a court is reviewing legal or factual decisions. *Namenyi v. Tomasello*, 2d Dist. Greene No. 2013-CA-75, 2014-Ohio-4509, ¶ 19-20. Decisions of law are reviewed de novo, while in cases involving R.C. 2323.51(A)(2)(a)(iii), trial courts must "make factual determinations which are given deference so long as there is competent, credible evidence to support those findings." *Stremmel v. Demmery*, 2d Dist. Miami No. 2016-CA-18, 2017-Ohio-5500, ¶ 21, citing *John Breen v. Total Quality Logistics*, 10th Dist. Franklin No. 16AP-3, 2017-Ohio-439, ¶ 11. Consequently, one issue we must decide is whether competent, credible evidence supported the trial court's decision.

{¶ 169} Before doing so, however, we must first consider Matthews's argument that the court erred by failing to hold an evidentiary hearing on whether frivolous conduct occurred.

A. Requirement of Evidentiary Hearing

{¶ 170} While R.C. 2323.51(B) allows courts to award fees, R.C. 2323.51(B)(2) contains certain requirements before the court can do so. First, the court must set "a

date for a hearing to be conducted in accordance with division (B)(2)(c) of this section, to determine whether particular conduct was frivolous, to determine, if the conduct was frivolous, whether any party was adversely affected by it, and to determine, if an award is to be made, the amount of that award."   R.C. 2323.51(B)(2)(a).   Second, the court must send notice of the hearing date to all parties and counsel accused of frivolous conduct and to the affected parties.   R.C. 2323.51(B)(2)(b).

{¶ 171} Third, under R.C. 2323.51(B)(2)(c), the court then:

Conducts the hearing described in division (B)(2)(a) of this section in accordance with this division, allows the parties and counsel of record involved to present any relevant evidence at the hearing, including evidence of the type described in division (B)(5) of this section, determines that the conduct involved was frivolous and that a party was adversely affected by it, and then determines the amount of the award to be made.

{¶ 172} The evidence R.C. 2323.51(B)(5) refers to includes "an itemized list or other evidence of the legal services rendered, the time expended in rendering the services," and "an itemized list or other evidence of the costs and expenses that were incurred in connection with that action or appeal and that were necessitated by the frivolous conduct, including, but not limited to, expert witness fees and expenses associated with discovery."   R.C. 2323.51(B)(5)(a) and (b).

{¶ 173} We have previously held that some requirements in R.C. 2323.51(B)(2) may be waived.   *Whitt v. Whitt*, 2d Dist. Greene No. 2003-CA-82, 2004-Ohio-5285, ¶ 18.

{¶ 174} As noted earlier, Appellees filed a motion on November 20, 2019, seeking an award of attorney fees and costs/expenses against both HNB and its counsel, Craig

Matthews. Attached to the motion were the affidavits of Richard Boucher (Appellees' attorney), and Jack, outlining their legal credentials. Also attached were billing records between June 6, 2017, and November 20, 2019, and a statement of expenses between August 28, 2018, and September 9, 2019. Exs. B and C, respectively.

{¶ 175} On December 5, 2019, HNB asked the court to stay the hearing on the attorney fee request until after the pending appeal was resolved, as the court had previously done with the other post-judgment motions that were filed. The court did not rule on this motion. As noted, we chose not to dismiss the appeal but remanded the case on January 29, 2020, so the trial court could resolve all pending post-judgment motions.

{¶ 176} Subsequently, on February 27, 2020, the trial court filed an order setting a schedule for prejudgment interest and attorney fees. The court set the following deadlines: March 20, 2020, for identifying experts; April 20, 2020, for deposing expert witnesses; and May 20, 2020, for a hearing on the motions. *Id.* at p. 2. A further entry was filed setting the hearing for May 20, 2020 at 1:30 p.m. The court thus complied with R.C. 2323.51(B)(2)(a) by setting a hearing. The court also complied with R.C. 2323.51(B)(2)(b), as the hearing notice was sent to all the parties, including Matthews.

{¶ 177} On March 2, 2020, HNB substituted Martin Foos and Terry Posey as counsel in place of Matthews. Due to the Covid-19 emergency, the time for taking depositions was extended, and on April 27, 2020, Appellees sent Matthews notices of depositions being taken of Jack and of their expert, Jeff Ireland, on April 29, 2020. They also sent Appellees' responses to discovery requests and the hearing notice for the attorney fee hearing.

{¶ 178} Subsequently, on May 14, 2020, HNB filed a prehearing brief, setting out its position on the fee award. The document did not specifically discuss frivolous conduct, but it set out amounts by which any potential fee award should be reduced. Then, on May 15, 2020, George Johnson entered an appearance as counsel for Matthews. However, Matthews never filed any motions or responses concerning Appellees' motion for attorney fees.

{¶ 179} On May 20, 2020, the court held a hearing on all post-judgment motions, with all relevant parties and their counsel present. At the beginning of the hearing, Appellees' counsel notified the court of various stipulations to which he and HNB had agreed. These stipulations were primarily that the experts (Ireland for Appellees and Thomas Green for HNB) were qualified, and that Ex. A was a true copy of a fee agreement between Appellees and their counsel, Richard Boucher. Transcript of Proceedings (Hearing on Post-Trial Motions) ("Motion Tr."), p. 3-4. Matthews's counsel made no comments at this time.

{¶ 180} Furthermore, HNB, Matthews, and Matthews's counsel did not object to the form of the hearing, nor did they mention that they wished to call witnesses or provide evidence pertaining to frivolous conduct. Instead, HNB's counsel simply stated that HNB had filed a prehearing brief to give the court the legal guidance it needed and that HNB intended "to present opposing evidence, which was always going to be the case." *Id.* at p. 6.

{¶ 181} The only witnesses at the hearing were Ireland, Green, and Jack. Ireland and Green discussed what they had reviewed in preparation for their opinions, the fees that had been charged, whether the fees were properly attributed to the fee request, and

whether the fees were reasonable. *Id.* at p. 8-46 and 58-89. Jack primarily testified about his billing, including amounts for trial court proceedings, appeal, and the arbitration. *Id.* at p. 47-58.

{¶ 182} There was limited testimony about whether settlement discussions occurred. *Id.* at p. 56-58 (Jack) and p. 77-80, and 86 (Green). At the end of the testimony, the parties elected to address prejudgment and post-judgment interest in oral argument rather than factually, i.e., by evidence. *Id.* at p. 99-102. Matthews's counsel asked about submitting a post-trial brief, but the court said that it would instead give him any time he needed to address matters during oral argument. *Id.* at p. 101-102.

{¶ 183} During its closing argument, HNB stated: "We have not presented extra testimony beyond what is already in the record because we didn't feel you needed to have all this extra about what is frivolous and what isn't. The record has already been made, you know, you can make that decision." Motion Tr. at p. 113-114.

{¶ 184} When Matthews's counsel made his oral statement, he stressed that neither HNB nor Appellees presented evidence about Matthews's frivolous conduct. He also noted the lack of testimony by HNB concerning its desire to dismiss claims against Appellees, i.e., that HNB had wanted to dismiss claims but that Matthews had talked HNB out of doing so. *Id.* at p. 120. In addition, Matthews's counsel pointed out that the only independent conduct the court had mentioned was Matthews's tweet, which related to defamation and false light, but had "nothing to do with the frivolous conduct." *Id.* at p. 121.

{¶ 185} Given these statements, Matthews's counsel was not arguing that he wanted to present evidence; he was simply stating there was no evidence against

Matthews for purposes of awarding attorney fees. Since Matthews never asked the court to present evidence, we conclude that he waived this point and that the trial court did not err by failing to comply with the evidentiary requirement in R.C. 2323.51(B)(2)(c). *Whitt*, 2d Dist. Greene No. 2003-CA-82, 2004-Ohio-5285, at ¶ 18. *See also Shields v. Englewood*, 172 Ohio App.3d 620, 2007-Ohio-3165, 876 N.E.2d 972, ¶ 45-50 (2d Dist.).

{¶ 186} Furthermore, given the statements that HNB's counsel made during the hearing, we also conclude that HNB waived its argument that Appellees had failed to present evidence about frivolous conduct during the hearing. Whether the evidence of record sufficiently supported the frivolous conduct finding, however, is a different issue.

### B. Evidence of Frivolous Conduct.

{¶ 187} As noted, the factual issue here is whether competent, credible evidence supported the trial court's decision. *Stremmel*, 2d Dist. Miami No. 2016-CA-18, 2017-Ohio-5500, at ¶ 21. In this regard, the trial court's decision stated, in pertinent part:

> Frivolous conduct is defined at subsection (ii) as "allegations or other factual contentions that have no evidentiary support." The test is whether no reasonable lawyer would have brought the action in light of existing law. Pitcher v. Waldman, 1st Dist. No. G160245, 2016-Ohio-5491. * * *

> Plaintiff alleged in the Complaint and Affidavit in support of its Motion for a Temporary Restraining Order that John Hilgeman and Christopher Cowan "used the firms trade secrets," that their use was "willful and malicious," that they "secretly and in a manner inconsistent with the norms of legal professionals, secretly and hurriedly procured the breach of many

of the firm's agreements," and "were active participants . . . in carrying out the weekend raid . . ." (of the firms client files.)   These allegations stood until Plaintiff rested at trial and the Court dismissed the Complaint against John Hilgeman and Christopher on Defendants' Rule 41 Motion, ruling that "each and every allegation against them was totally lacking in proof and made with reckless disregard of the truth."   The hearing on May 20, 2020 resulted in no suggestion that the Court's during-the-trial finding was erroneous nor that the conduct of Plaintiff and its Counsel was other than "frivolous" and motivated by ill will.

Order (June 9, 2020), at p. 4-5.

{¶ 188} As a preliminary point, the trial court's decision was incorrect on some factual grounds.   The allegation that Defendants "secretly and in a manner inconsistent with the norms of legal professionals, secretly and hurriedly procured the breach of many of the firm's [engagement] agreements" did not remain in the case until being dismissed at trial.   In fact, these statements were contained in Count Two of the Complaint and were no longer part of the case after the arbitration proceeding ended in March 2018. *See* Order Confirming Arbitration Award and Order on Pending Motions (noting that the first four counts of the complaint were resolved by the arbitration decision), and Trial Tr. at p. 23-24.   Although the court later changed its mind and let HNB proceed on its trade secret claim (Count One) against John, Jack, and Chris, this ruling did not extend to Count Two.[15]

---

[15] We are aware that the Complaint contains the stock phrase "Plaintiff incorporates all of the allegations above as if fully rewritten herein," in connection with the counts that followed Count Two.   *See* Complaint at ¶s 45, 49, 51, 53, and 55.   However, the

**{¶ 189}** In analyzing R.C. 2323.51(A)(2)(a)(iii), the Tenth District Court of Appeals observed that it "is similar to the language in Fed.R.Civ.P. 11(b)(3), which states that, by presenting a pleading to the court, an attorney or unrepresented party certifies that 'the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.' " *Carasalina, L.L.C. v. Bennett*, 10th Dist. Franklin No. 14AP-74, 2014-Ohio-5665, ¶ 32. The court further observed that while R.C. 2323.51 is a statute rather than a rule, both R.C. 2323.51 and Fed.R.Civ.P. 11 "sanction the same behavior: asserting a claim lacking (or not likely to have) evidentiary support." *Id.* Given this similarity, *Carasalina* looked to federal authority for help in interpreting R.C. 2323.51(A)(2)(a)(iii). *Id.*

**{¶ 190}** The particular sources consulted were the 1993 Advisory Committee Notes for Fed.R.Civ.P. 11. *Id.* at ¶ 34. These notes state, in relevant part, that:

> [S]ometimes a litigant may have good reason to believe that a fact is true or false but may need discovery, formal or informal, from opposing parties or third persons to gather and confirm the evidentiary basis for the allegation. Tolerance of factual contentions in initial pleadings by plaintiffs or defendants when specifically identified as made on information and belief does not relieve litigants from the obligation to conduct an appropriate investigation into the facts that is reasonable under the circumstances; it is not a license to join parties, make claims, or present defenses without any factual basis or justification. Moreover, if evidentiary support is not

---

allegations in question clearly related only to the claim in Count II (breach of the firm's engagement agreements with clients).

obtained after a reasonable opportunity for further investigation or discovery, the party has a duty under the rule not to persist with that contention. Subdivision (b) does not require a formal amendment to pleadings for which evidentiary support is not obtained, but rather calls upon a litigant not thereafter to advocate such claims or defenses.

The certification is that there is (or likely will be) "evidentiary support" for the allegation, not that the party will prevail with respect to its contention regarding the fact. That summary judgment is rendered against a party does not necessarily mean, for purposes of this certification, that it had no evidentiary support for its position. On the other hand, if a party has evidence with respect to a contention that would suffice to defeat a motion for summary judgment based thereon, it would have sufficient "evidentiary support" for purposes of Rule 11.

**{¶ 191}** Having reviewed the Advisory Committee Notes, the Tenth District Court of Appeals concluded that "a party only needs minimal evidentiary support for its allegations or factual contentions in order to avoid a frivolous conduct finding. If a party makes an allegation or factual contention on information or belief, then the party must have the opportunity to investigate the truth of that allegation or factual contention. However, if a party persists in relying on that allegation or factual contention when no evidence supports it, then the party has engaged in frivolous conduct under R.C. 2323.51(A)(2)(a)(iii)." *Carasalina,* 10th Dist. Franklin No. 14AP-74, 2014-Ohio-5665, at ¶ 36.

**{¶ 192}** Furthermore, courts have said that "[a]n attorney's knowledge, however,

is not relevant to whether frivolous conduct has occurred. R.C. 2323.51 employs an objective standard in determining whether a party or its attorney has engaged in frivolous conduct." *Southard Supply, Inc. v. Anthem Contractors, Inc.*, 10th Dist. Franklin No. 16AP-545, 2017-Ohio-7298, ¶ 29, citing *State ex rel. Striker v. Cline*, 130 Ohio St.3d 214, 2011-Ohio-5350, 957 N.E.2d 19, ¶ 21. "Thus, a court does not look to what the party or its attorney knew or believed in deciding whether the conduct at issue is frivolous. * * * The plain language of R.C. 2323.51(A)(2)(a)(iii) requires a court to consider whether evidence existed to support the allegations or factual contentions in question, not whether the party or attorney knew of that evidence." (Citations omitted.) *Id*.

{¶ 193} The Supreme Court of Ohio has also stressed that egregious conduct must be involved, and that "[f]rivolous conduct is not proved merely by winning a legal battle or by proving that a party's factual assertions were incorrect." *State ex rel. DiFranco v. S. Euclid*, 144 Ohio St.3d 571, 2015-Ohio-4915, 45 N.E.3d 987, ¶ 15, citing *Ohio Power Co. v. Ogle*, 4th Dist. Hocking No. 12CA14, 2013-Ohio-1745, ¶ 29-30. *Accord Hamlin v. Bosse*, 2d Dist. Miami No. 2017-CA-26, 2018-Ohio-2657, ¶ 14. " ' "[A] claim is frivolous if it is absolutely clear under the existing law that no reasonable lawyer could argue the claim." ' " *DiFranco*, quoting *Ohio Power* at ¶ 30. (Other citation omitted.)

{¶ 194} Based on our review of the evidence, and for the reasons previously discussed, we find competent, credible evidence to support the trial court's finding that HNB and Matthews engaged in frivolous conduct concerning the trade secret and fraud claims against John and Chris. We agree with the trial court that the frivolous conduct began on September 28, 2018. However, the court's decision to assess fees from the date the complaint was filed was not supported by competent evidence and was not

based on sound reasoning.

{¶ 195} HNB's trade secret claim was based on a belief that its client list and work product (WC and PI checklists) were proprietary and/or privileged. Trial Tr. at p. 175, 176, 199-201, 204, 207, 393, 394, 396, 397, 402, 406, 526, and 905, and Plaintiff's Ex. 8. The fraud claims were based on Jack's departure from HNB and the manner in which it was executed, including Jack's immediate move to C&H and actions taken by Appellees to assist in the move. Trial Tr. at p. 139-141, 151, 160, 230, 289, 335, 415, 417, 421, 536, 538, 543, 549, 567, 568, 604, 733, 734, 886, 887, 896, 897, 898, and 902.[16]

{¶ 196} Notably, the court's January 3, 2019 Order overruling HNB's summary judgment motion in part (and restoring the trade secrets claim) stated that client lists were arguably trade secrets under R.C. 1336.61, and that there was "a question whether Defendant [Jack] Hilgeman appropriated, as defined at Section 1336.61(B)(1), those documents." Order Addressing Plaintiff's Motion for Summary Judgment (Dec. 31, 2018), at p. 3.

{¶ 197} Appellees did not file a motion for summary judgment on the merits of either the trade secret or fraud claims. Instead, their position was that the trade secrets claim was barred by the arbitration decision, and that the fraud claim (the seventh claim for relief) was not a fraud claim, but involved claims for negligence, estoppel, and conversion, which were barred under Ohio law. See Motion of John Hilgeman and

---

[16] This is not to say that HNB prevailed on these points; we are simply noting that testimony was given and arguments were made.

Christopher Cowan for Summary Judgment (Aug. 9, 2018), p. 2-3.[17]

{¶ 198} In its attorney fee decision, the trial court did not find that, under existing law, no reasonable lawyer could argue the trade and fraud secret claims when the complaint was filed.   It is true that the court concluded, in dismissing John and Chris as defendants at the end of HNB's case, that the claims against them were not factually established.   Trial Tr. at p. 627 and 680-681.   However, this was a factual failure of proof.   Ultimately, the court also found that HNB's efforts to retain trade secrecy were insufficient, and that Jack, while breaching the contract, did not commit fraud.   Judgment (Oct. 22, 2019), at p. 5 and 7.   Again, these were failures of factual proof.

{¶ 199} As noted, after complaints are filed, litigants are given some latitude to conduct discovery and investigate.   However, where "a party persists in relying on that allegation or factual contention when no evidence supports it, then the party has engaged in frivolous conduct under R .C. 2323.51(A)(2)(a)(iii)."   *Carasalina*, 10th Dist. Franklin No. 14AP-74, 2014-Ohio-5665, at ¶ 36.   Thus, HNB and Matthews engaged in frivolous conduct if a reasonable lawyer would not have persisted in maintaining the claims against Appellees after investigating and conducting discovery.

{¶ 200} In its decision on prejudgment interest and attorney fees, the trial court awarded prejudgment interest from September 28, 2018, because HNB was aware by then that there was no evidentiary support for its position concerning the claims against Appellees.   Order (June 9, 2020), at p. 2-3.   This was after HNB took the depositions of Appellees in September 2018.   *Id.* at p. 3.   Although prejudgment interest is no longer

---

[17] This motion was filed before HNB took John and Chris's depositions.   Appellees also filed an amended summary judgment motion on October 31, 2018, raising the same points.

warranted due to our decision on the defamation and false light counterclaims, there was still competent, credible evidence in the record to indicate that by September 28, 2018, reasonable lawyers would no longer have argued that Appellees had committed fraud and trade secret violations.   Accordingly, we agree that by September 28, 2018, HNB and Matthews had engaged in frivolous conduct.   Thus, while awarding attorney fees back to the date of the filing of the complaint was unwarranted, fees could be awarded from this date forward.

## C.   Amount of Fees Awarded

{¶ 201} The final issue concerns the amount of fees awarded.   HNB has included this issue in its general assignment of error regarding frivolous conduct.   In contrast, Matthews has framed it as his second assignment of error, which, as noted, states that:

> Even Had Cowan and Hilgeman Proved Matthews Engaged in Frivolous Conduct, the Trial Court Erred in the Amount of Attorney Fees and Expenses Awarded.

{¶ 202} Concerning the amount of fees awarded, HNB argues that the trial court erred in failing to deduct fees for work Jack performed in his own defense.   Matthews agrees and adds that the court should not have assessed fees that would have been incurred even if Appellees had not been sued.   Despite the fact that the attorney fee award is being reversed in part, we will address these points, because the trial court will need to consider attorney fees on remand.

{¶ 203} The trial court awarded the following amounts of fees, calculated from the date the complaint was filed:

(1) Attorney fees of $168,348.40 minus the following items: $3,577 (fees for Jack defending himself), $10,053 (fees for the arbitration), and $2,190 (for appeals), or a total of $152,528.40.

(2) Necessary expenses in the amount of $10,053.

Order (June 9, 2020), at p. 7-8.

{¶ 204} As a preliminary point, the trial court's award of necessary expenses was incorrect. During the post-judgment hearing, Appellees presented a total of $168,348.40 in attorney fees and $10,577.95 in costs and expenses, including payment of expert witness fees for Appellees' expert. Motion Tr. at p. 14-15, and Supplemental Application for Attorneys' Fees (May 22, 2020), Exs. B and C. The $168,348.40 amount included $10,053 in fees incurred for arbitration, and HNB's expert testified that the arbitration fees should not be included. Motion Tr. at p. 66. As indicated above, the trial court agreed and deducted that amount from the attorney fees. However, the court then added the same amount back in for "necessary expenses." This was clearly erroneous and did not reflect the correct amount of costs and expenses ($10,577.95) shown on the Supplemental Application.

{¶ 205} Turning now to the appropriate amount of fees, any fees awarded should have begun, at the earliest, with items beginning *after* September 28, 2018, because that is when HNB and Matthews no longer had a reasonable basis for their claims against Appellees. Those fees start on page 26 of Ex. B of the Supplemental Application. For the same reason, any award for costs or expenses should have begun after September 28, 2018. There were further limitations, however.

{¶ 206} In situations that do not involve contingent fees, R.C. 2323.51(B)(3)(b)

provides that "[t]he amount of an award made pursuant to division (B)(1) of this section that represents reasonable attorney's fees shall not exceed, and *may be equal to or less than* * * * the attorney's fees that were reasonably incurred by a party." (Emphasis added.) In *Southard*, the Tenth District Court of Appeals stated that: "R.C. 2323.51(B)(3) allows the trial court to award an amount 'equal to or less than' the fees 'reasonably incurred.' Thus, a trial court has the discretion to award reasonable attorney fees that fall short of the total amount of fees reasonably incurred. *See Scott v. Namath*, 10th Dist. No. 16AP-64, 2016-Ohio-5532, ¶ 30-32 (holding that R.C. 2323.51 affords trial courts the discretion to reduce awards of reasonable attorney fees all the way down to zero)." *Southard*, 10th Dist. Franklin No. 16AP-545, 2017-Ohio-7298, at ¶ 45.

{¶ 207} To decide the amount of fees, courts "must use the lodestar method of calculating fees set forth in *Bittner v. Tri-County Toyota, Inc.*, 58 Ohio St.3d 143 (1991)." *Id.*, citing *State ex rel. Bell v. Madison Cty. Bd. of Commrs.*, 139 Ohio St.3d 106, 2014-Ohio-1564, 9 N.E.3d 1016, ¶ 21. The lodestar is "the reasonable hourly rate multiplied by the number of hours worked." *Phoenix Lighting Group, L.L.C. v. Genlyte Thomas Group, L.L.C.*, 160 Ohio St.3d 32, 2020-Ohio-1056, 153 N.E.3d 30, ¶ 1.

{¶ 208} In *Phoenix*, the Supreme Court of Ohio reaffirmed *Bittner* "to the extent that it held that a lodestar can be modified." However, the court also modified *Bittner* to hold that "the lodestar is presumptively reasonable and that enhancements to the lodestar should be rarely granted and allowed only when the prevailing party has presented evidence that enhancement is necessary to provide reasonable compensation, that is, if the lodestar does not take into consideration any factor that may be properly considered in determining a reasonable fee." *Id.* at ¶ 2, citing *Perdue v. Kenny A. ex rel. Winn*, 559

U.S. 542, 130 S.Ct. 1662, 176 L.Ed.2d 494 (2010).

{¶ 209} In explaining this point, the Supreme Court of Ohio commented that its "holding in *Bittner* – that a court may modify a fee calculation based on the application of the factors set forth in what is now Prof.Cond.R. 1.5(a) – established the lodestar as an ' "initial estimate" ' of a reasonable fee. * * * But nearly all of those factors are included as part of the hourly fee used to calculate the lodestar. * * * Thus, the factors in Prof.Cond.R. 1.5(a), including the results obtained, are subsumed within the lodestar; they do not enhance the lodestar."   (Citations omitted.)   *Id.* at ¶ 16-17.

{¶ 210} In addition, the court stressed that *Bittner* should not be viewed as allowing modification as a matter of course and that "any modification must be accompanied by a rationale justifying the modification."   *Id.* at ¶ 20.

{¶ 211} Because the fees must be those "reasonably incurred," we do not think all the fees incurred after September 28, 2018 should have been awarded.   This is because the finding of frivolous conduct applied only to Appellees (John and Chris), not Jack.   The claims against Jack, whether ultimately successful or not, were not frivolous, and no attorney fees should have been awarded for defending those claims or for prosecution of Jack's counterclaim for defamation.   Likewise, Appellees were not entitled to recover attorney fees that were incurred in pursing their counterclaims for defamation and false lights.   They did not prevail on these claims and attorney fees, therefore, were not "reasonably incurred" in this regard.

{¶ 212} Turning to the issue of whether attorney fees could be awarded for Jack's time, the trial court appears to have agreed with HNB and Matthews that Jack could not be awarded fees for time he spent representing his own interests.   Specifically, the court

did deduct part of the fees Jack spent defending the claims against him, or for his "pro se" work as an attorney. This is evident from the following statement of the court:

> The more intriguing part of Defendants' Motion for Attorney Fees is that portion, $25,040, wherein Defendant Jack Hilgeman, an attorney, seeks the recovery of attorney fees for his assistance in defending the four claims against his father and Christopher Cowan and in asserting the defamation and false light claims against the Plaintiff law firm. In support of the argument that the recovery of Jack Hilgeman's attorney fees should not be recovered, Plaintiff says that there was no Entry of Appearance signed by Jack Hilgeman, that the memorialization of the fee agreement signed by all three Defendants failed to mention any co-representation by Jack Hilgeman, and that he billed in ten-minute increments, a provision not contained in the fee agreement between counsel and the represented parties. Nevertheless, while the form may be lacking, the substance of the legal relationship between Jack Hilgeman and the other Defendants was there. Simply put, there were five claims against all defendants and two counterclaims. The sole claim that applied to Jack Hilgeman, the breach of contract claim, was the one claim wherein he represented himself in pro se status. 6/7 of Jack Hilgeman's fees were in defense of the claims against the other Defendants or in the assertion of the false light claims against Plaintiff. Therefore, *he* is entitled to 6/7 of $25,040 or as otherwise stated, an attorney fee of $21,463.

(Emphasis added.) Order (June 9, 2020), at p. 7-8. This amount was included in the

total amount of attorney fees ($152,528.40) that the trial court awarded.   *Id.* at p. 8-9.

**{¶ 213}** The trial court's analysis, however, was confusing and was not supported by sound reasoning.   Specifically, HNB asserted seven counts in the complaint.   Adding the two counterclaims asserted against HNB made 9 claims in total.   Before trial began, three of HNB's claims had been removed, meaning that four claims (not five) remained.[18] This, plus the two counterclaims, added up to six claims (not seven).   And, Jack was still representing himself solely on two claims (Counts Five and Six for breach of contract).

**{¶ 214}** Even if this were otherwise, the court's reasoning was incorrect.   The court awarded Jack 6/7 of the $25,040 in attorney fees, based on the fact that the sole claim on which Jack represented himself pro se (the breach of contract claim), consisted of only one-seventh of the case.   Order, at p. 8.

**{¶ 215}** However, HNB's expert expressly stated that the $25,040 deduction in fees (or 125.2 hours of time) was for work Jack did on his *own claims* and that he did not include with this amount Jack's defense of the other defendants or in asserting the counterclaims.   Motion Tr. at p. 65.   In this regard, the expert stated that Jack spent 77.2 hours (or $15,440 worth of fees) in exclusively representing John and Chris.   *Id.* at p. 67 and Hearing Ex. 13, Item 5.   Ultimately, the expert added the $15,440 amount to the attorney fees that Chris and John might appropriately be awarded for frivolous conduct. *Id.* at p. 68-70.

**{¶ 216}** The trial court's entry was also confusing in that it clearly awarded Jack 6/7 of the $25,040, rather than awarding it to the persons who were affected by the

---

[18] The claims that no longer existed were breach of the firm's engagement interests, interference with business relationships, and unjust enrichment (Counts Two, Three, and Four of the Complaint).

frivolous conduct. The text of the order quoted above noted that Jack was seeking his own attorney fees for his efforts, and the court's finding was that Jack ["he"] was entitled to these fees. However, the frivolous conduct finding was only in favor of Appellees, John and Chris, not Jack. Jack would not be entitled to recover any attorney fees for work on his own case, as neither HNB nor Matthews had engaged in frivolous conduct with respect to his claims. And Appellees would not have been entitled to recover for Jack's work on his own claims, as those were not fees that they "reasonably incurred." Therefore, whether Jack, as an attorney and party defendant, was entitled to fees for his pro se work, was irrelevant.

{¶ 217} Even if it were relevant, we agree with the reasoning in *DiPaolo v. Moran*, 277 F.Supp.2d 528 (E.D. Pa.2003), a case that was cited by Matthews in his brief and reply brief. Matthews Brief, p. 9-10 and 13; Matthews Reply Brief, p. 9. Appellees did not address the issues raised in that case.

{¶ 218} In *DiPaolo*, the plaintiff was a township police officer who had been fired for refusing to answer questions during an investigation of his involvement in a peeping tom incident. *Id.* at 529. He then filed suit against 15 defendants, including an attorney (Morris) and the attorney's law firm, alleging various state and federal constitutional violations of his rights. *Id.* Morris and the law firm were included due to actions they had taken as counsel for the township. *Id.*

{¶ 219} During the litigation, Morris filed a motion for sanctions under Fed.R.Civ.P. 11 and 28 U.S.C. 1927, which the court granted against the plaintiff and his attorney. *Id.*

at 530.[19]  After the plaintiff dismissed the action, the court considered several issues, including whether pro se litigant attorneys can "recover attorneys' fees under Rule 11 or § 1927 for self-representation."  *Id.* at 531.    In discussing the matter, the court concluded, at the outset, that the attorney could not recover fees for representing himself, "[b]ecause the language of both Rule 11 and § 1927 implies 1) an attorney-client relationship and 2) the accumulation of fees, both of which are absent when an attorney represents himself."  *Id.* at 534.

**{¶ 220}** In considering whether fees could be allowed for the time the attorney spent defending the law firm rather than himself, the court noted that:

> Of the three Circuit Courts of Appeals that have addressed whether pro se attorney litigants may receive fees as a result of the sanctionable conduct of an opponent, two have held that the terms contained in Rule 11 and § 1927 – or similar statutes – bar pro se attorney litigants from receiving fees for self-representation.  In *Massengale v. Ray*, 267 F.3d 1298 (11th Cir.2001), the Eleven Circuit Court of Appeals held that "[b]ecause a party proceeding pro se cannot have incurred attorneys' fees as an expense, a district court cannot order a violating party to pay a pro se litigant a reasonable attorney's fee as part of a sanction."  *Id.* at 1302-03.  Moreover, it stated that " '[t]he word "attorney" generally assumes some kind of agency (that is, attorney/client) relationship. The fees a lawyer might

---

[19]  28 U.S.C. 1927 provides that "[a]ny attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."

charge himself are not, strictly speaking, "attorney's fees." ' " *Id.* at 1303

(quoting *Ray v. U.S. Dep't of Justice*, 87 F.3d 1250, 1251 n. 2 (11th

Cir.1996).

(Footnote omitted.) *Id.* at 535.

**{¶ 221}** *DiPaolo* also noted a decision involving Fed.R.Civ.P. 37 sanctions, in which the Federal Circuit Court of Appeals had held that " 'one cannot "incur" fees payable to on[e]self, fees that one is not obliged to pay.' " *Id.*, quoting *Pickholtz v. Rainbow Technologies, Inc.*, 284 F.3d 1365, 1375 (Fed.Cir.2002). Also quoting *Massengale*, the Federal Circuit Court of Appeals in *Pickholtz* had focused on the fact that " 'the word "attorney" connotes an agency relationship between two parties (client and attorney), such that fees a lawyer might charge himself are not "attorney fees." ' " *Id.*, quoting *Pickholz* at 1375.

**{¶ 222}** Concerning the third appellate decision, which was from the Ninth Circuit Court of Appeals, *DiPaolo* declined to follow that decision, which had upheld an award of attorney fees to pro se attorneys under the Civil Rights Act of 1964. *Id.*, discussing *Ellis v. Cassidy*, 625 F.2d 227 (9th Cir.1980). The first reason was that while *Ellis* "articulated many public policy reasons in support of its holding – all of which were well-reasoned – the court never addressed the implication of the statutory term 'attorney.' " *Id.* at 535-536. In addition, the court questioned *Ellis's* continued validity in view of the decision of the United States Supreme Court in *Kay v. Ehrler*, 499 U.S. 432, 111 S.Ct. 1435, 113 L.Ed.2d 486 (1991), which "did analyze that term in the context of an award of attorneys'

fees to a pro se attorney plaintiff pursuant to 42 U.S.C. § 1988." *Id.* at 536.[20]

**{¶ 223}** In *Kay*, the United States Supreme Court rejected an attorney's request for attorney fees for representing himself. The court noted that "the word 'attorney' assumes an agency relationship." *Kay* at 435. In this context, the court noted the definition of "attorney" in *Webster's Dictionary* and other dictionaries, including *Black's Law Dictionary*, as a person " 'who is legally appointed by another to transact business for him," and " '[a]n agent or substitute, or one who is appointed and authorized to act in the place or stead of another.' " *Id.* at 436, fn. 6, quoting *Webster's New Collegiate Dictionary* 73 (1975), and *Black's Law Dictionary* 128 (6th Ed. 1990).

**{¶ 224}** While the Supreme Court concluded that Congress likely "contemplated an attorney-client relationship as the predicate for an award under § 1988," the court did not rely solely on this ground. Instead, the court discussed other reasons why attorney fees should not be granted to pro se attorneys who represent themselves. To this point, the court stressed that:

> Even a skilled lawyer who represents himself is at a disadvantage in contested litigation. Ethical considerations may make it inappropriate for him to appear as a witness. He is deprived of the judgment of an independent third party in framing the theory of the case, evaluating alternative methods of presenting the evidence, cross-examining hostile

---

[20] The Ninth Circuit Court of Appeals did subsequently conclude that *Ellis* was no longer good law in light of the decision in *Kay*. This was based on Kay's broad sweep and the fact that "some of the policy considerations discussed in *Kay* would be served by encouraging independent counsel for defendants." *Elwood v. Drescher*, 456 F.3d 943, 947 (9th Cir.2006), *abrogated on other grounds*, *Citizens for Free Speech, LLC v. Cty. of Alameda*, 953 F.3d 655, 658 (9th Cir.2020).

witnesses, formulating legal arguments, and in making sure that reason, rather than emotion, dictates the proper tactical response to unforeseen developments in the courtroom. The adage that "a lawyer who represents himself has a fool for a client" is the product of years of experience by seasoned litigators.

A rule that authorizes awards of counsel fees to pro se litigants – even if limited to those who are members of the bar – would create a disincentive to employ counsel whenever such a plaintiff considered himself competent to litigate on his own behalf. The statutory policy of furthering the successful prosecution of meritorious claims is better served by a rule that creates an incentive to retain counsel in every such case.

(Footnotes omitted.) *Kay*, 499 U.S. at 437-38, 111 S.Ct. 1435, 113 L.Ed.2d 486.

**{¶ 225}** After discussing the *Kay* decision and the Circuit Court cases, the court in *DiPaolo* held that while the attorney was "not entitled to fees generated as result of defending himself, * * * he may be entitled to incremental fees incurred as a result of defending his law firm. Put simply, by representing his law firm, Morris created an attorney-client relationship, thereby diminishing, if not eviscerating, the primary reasoning for the above cited circuit court cases." (Footnote omitted.) *DiPaolo*, 277 F.Supp.2d at 536. In a footnote, the court stressed, however, that this would "require evidence concerning the owners, directors, and officers of the law firm and its fee arrangement with Morris, if any, related to this action." *Id.* at 536, fn. 11.

**{¶ 226}** We agree with the approach in *Kay* and *DiPaolo*. We have already noted the similarity between Fed.R.Civ.P. 11 and R.C. 2323.51. And, like 28 U.S.C. 1927. R.C.

2323.51(B)(3)(b) refers to an award of "attorney's fees that were reasonably incurred." *See also* 42 U.S.C. 1988 (allowing a prevailing party to obtain "a reasonable attorney's fee as part of the costs").

**{¶ 227}** We have also indicated that Jack was not entitled to any fees incurred in defending himself because there was no frivolous conduct finding in his favor. However, in view of the above discussion, Appellees also were not entitled to any attorney fees for Jack's actions in defending himself. As a result, we agree that the trial court erred in including the $21,463 amount that Jack expended on his own claims in the attorney fees that were awarded.

**{¶ 228}** Appellees, however, may be entitled to fees for Jack's actions in representing them on the fraud and trade secret claims. Because this case is being remanded for consideration of the appropriate amount of attorney fees (which could include fees HNB's expert attributed to Jack's representation solely of Appellees), the court and parties are directed to *Marshall v. Cooper & Elliott*, 2017-Ohio-4301, 82 N.E.3d 1205 (8th Dist.), which considered the meaning of "incur" as used in R.C. 2323.51(B)(1).

**{¶ 229}** In *Marshall*, the trial court had awarded $0 to a party claiming attorney fees because the party "failed to establish that he 'incurred' any obligation to pay any legal fees in this matter." *Id*. at ¶ 28. In reviewing the matter, the Eighth District Court of Appeals observed that "the trial court's decision to award [the client] Dolan $0 in legal fees was not, as Dolan contends, based simply on the fact that there were no prior billings or 'written fee agreement' between Dolan and O'Shea [Dolan's attorney], but rather, based on the finding that there was no fee agreement of any kind between O'Shea and Dolan that would legally obligate Dolan to pay any legal fees for O'Shea's work in this

matter."   *Id.* at ¶ 29.

{¶ **230**} After considering the meaning of "incur" and other related terms in *Black's Legal Dictionary*, the court concluded that "legal fees are 'incurred' under R.C. 2323.51(B)(1) and R.C. 2323.51(B)(3)(b) when a party has a legal obligation to pay them or otherwise becomes legally accountable for them, regardless of whether the fees have been or will be paid."   *Id.* at ¶ 31.   Among other things, the court distinguished *Grove v. Gamma Ctr.*, 3d Dist. Marion No. 9-14-29, 2015-Ohio-1180, and *Mikhael v. Gallup*, 9th Dist. Summit No. 22992, 2006-Ohio-3917, because the attorney in each case "indicated that he would not 'collect' on or would 'write off' a debt that the client would otherwise be legally obligated to pay."   *Marshall* at ¶ 36.   In contrast, in *Marshall*:

> O'Shea's testimony established not only that he had no written fee agreement with Dolan and had never billed Dolan for any of the work he performed on the case but also that he had no oral fee agreement whatsoever with Dolan.   Although O'Shea claimed to have an "arrangement" with Dolan pursuant to which, the amount, if any, Dolan paid O'Shea would be determined at some point in the future, he testified that he had never had any discussions with Dolan about what his fees would be. Thus, this case does not involve a lawyer's decision not to "collect" or to "write off" fees that would otherwise be owed.   In this case the trial court found that Dolan failed to establish that he had a legal obligation to pay any attorney fees in the first instance.

*Marshall*, 2017-Ohio-4301, 82 N.E.3d 1205, at ¶ 37.

{¶ **231**} At the post-judgment hearing, there was no testimony indicating that

Appellees actually incurred, i.e., were legally obligated to pay attorney fees to Jack. The affidavit that Jack submitted in connection with the Application for Attorneys' Fees stated only that Jack served as co-counsel in conjunction with Richard Boucher. Application for Attorneys' Fees and Costs (Nov. 20, 2019) Ex. A, Hilgeman Affidavit, ¶ 3. However, as the trial court noted, Jack never entered an appearance as co-counsel, nor was any evidence presented to show that Appellees entered into a fee agreement with Jack. The affidavits submitted with the fee application also said nothing about Appellees' legal obligation to pay Jack for his time. And at the hearing, Jack did not discuss any legal obligation or arrangement; he simply testified that he was never a pro se attorney, that he was "associated with Richard Boucher's office," and that he "didn't file a notice of appearance as a pro se counsel." Motion Tr. at p. 50.

{¶ 232} The above facts do not address the issue of whether Appellees were "legally obligated" to pay Jack attorney fees. We express no opinion on the specific amount of fees to be awarded; we are simply pointing out factors that should be considered.

{¶ 233} As a final matter, Matthews has also challenged the ratio of fees the trial court used. First, Matthews contends that the trial court erred in including the defamation and false light claims in its ratio, because the judgment on those claims did not warrant an award of attorney fees. Matthews also suggests what a more appropriate ratio would be. However, since the defamation and false light judgment is being reversed, this argument is moot as to those claims. Furthermore, the "ratio" the trial court used is irrelevant, since we have concluded that Appellees cannot collect *any fees* that Jack incurred in defending himself. This would include his fees for defending against the

breach of contract claims, the fraud claim, and the trade secret claim, and in prosecuting the counterclaims for defamation and false light. As indicated, Appellees may potentially recover for Jack's fees for defending them in connection with the trade secret and fraud claims.

{¶ 234} As a final point, we note that the Supreme Court of Ohio has disapproved of "block billing" and has indicated that it will no longer accept fee applications "that include block-billed time entries." *State ex rel. Harris v. Rubino*, 156 Ohio St.3d 296, 2018-Ohio-5109, 126 N.E.3d 1068, ¶ 7. Block billing consists of " 'lumping multiple tasks into a single time entry.' " *Id.* at ¶ 6, quoting *Tridico v. Dist. of Columbia*, 235 F.Supp.3d 100, 109 (D.D.C.2017). In the Supplemental Application for Attorneys' Fees, there were some instances of this practice. *E.g.,* Supplemental Application (May 22, 2020), p. 33 (entries for 11/11/18, 11/12/18, 11/13/18, and 11/14/18), and p. 41 (entry for 7/19/19, drafting of three motions). This, again, is a point to be considered in awarding fees on remand.

{¶ 235} Based on the preceding discussion, HNB's second assignment of error is sustained in part and is overruled in part, Matthews's first assignment of error is sustained in part and is overruled in part, and Matthews's second assignment of error is sustained in part and is overruled in part as moot.

## V. Conclusion

{¶ 236} HNB's first and third assignments of error are sustained, and HNB's second assignment of error is sustained in part and is overruled in part. Matthews's first assignment of error is sustained in part and is overruled in part, and Matthews's

second assignment of error is sustained in part and overruled in part as moot.

{¶ 237} Because certain aspects of the October 22, 2019 judgment have not been appealed, that judgment is affirmed in part and reversed in part. Specifically, the October 22, 2019 judgment in favor of John Hilgeman and Christopher Cowan on counterclaims for defamation and false light and against HNB is reversed, and the remainder of that judgment is affirmed.

{¶ 238} Concerning the June 9, 2020 judgment on the post-trial motions, that judgment is reversed in part and affirmed in part. The judgments of prejudgment and post-judgment interest are reversed. However, the court's judgment that HNB and Craig Matthews engaged in frivolous conduct is affirmed in part and reversed in part as to the date on which the frivolous conduct began and the time from which attorney fees may be calculated. The award of attorney fees is reversed and remanded for further hearing on what attorney fees may be awarded to Appellees in connection with the claims against them that were based on trade secrets and fraud.

. . . . . . . . . . . .

TUCKER, P.J., concurs.

HALL, J., concurs in part and dissents in part:

{¶ 239} I agree with my colleagues that the filing of the complaint, though containing false and otherwise defamatory material with respect to John Hilgeman and Christopher Cowan, was absolutely privileged and therefore could not be the basis for the award of damages. However, I disagree that the directing of the complaint to the news

and tweeting the false information was also shielded from liability. Therefore, I dissent in part and would affirm the damage award and the corresponding prejudgment interest award of the trial court. In my opinion, to hold otherwise allows a party to place materially false or even scurrilous information in a complaint, cause republication or dissemination, and then hide behind the cloak of the absolute privilege applicable to judicial proceedings.

{¶ 240} Here, the trial court directed attention to the record: "[o]ne only need look to the testimony of Fred Sommers to view the totality of the evidence against John Hilgeman and Chris Cowan and conclude that each and every allegation against them was totally lacking in proof and made with reckless disregard for the truth. (See Transcript, Pg.521-540)." Judgment (Oct. 22, 2019), at p. 20. That testimony supported the trial court's conclusions that the allegations of the complaint, with respect to Appellees John and Chris were "entirely false" and "totally unsupported by probable cause." The complaint falsely stated that these attorneys misappropriated trade secrets, converted assets of the HNB firm, and were "active participants" in and facilitated the "weekend raid" of the HNB office and files. They did none of those things. These statements were further authorized by HNB when HNB shareholder Fred Sommer signed an affidavit, filed at the same time as the complaint, stating that "I have reviewed the factual allegations contained in the Complaint and confirm they are true and correct."

{¶ 241} The trial court found, as a matter of fact, that HNB's "agent" disseminated the false information to the newspaper and publically tweeted about it. In my opinion the case of *Bochetto v. Gibson*, 580 Pa. 245, 860 A.2d 67 (2004) supports the notion that the act of sending the complaint to a reporter was a "republication" that "was an extrajudicial act that occurred outside of the regular course of the judicial proceedings and was not

relevant in any way to those proceedings." *Id*. at 73. See also *Landry's, Inc. v. Animal Legal Defense Fund*, 64 Tx.Sup.Ct. 1047, __ S.W.3d __, 2021 WL 2021130 (May 21, 2021). Therefore I would affirm the trial court's judgment as to damages for defamation and false light.

**{¶ 242}** Nonetheless, I agree with my colleagues that the trial court determined that the litigation became frivolous September 28, 2018. Had the trial court concluded that the frivolous conduct began with the filing of the complaint, I would find that such a conclusion was supported by the record and not an abuse of discretion. But because the trial court determined that the frivolous conduct began September 28, 2018, the award of attorney fees and costs must be revisited consistent with the majority opinion.

Copies sent to:

Terry W. Posey, Jr.
Martin A. Foos
George D. Jonson
G. Todd Hoffpauir
Richard A. Boucher
Craig Matthews
Hon. Timothy S. Hogan, Visiting Judge